For the foregoing reasons, the judgment of the district court is AFFIRMED.

WIDENER, Circuit Judge, concurring:

I concur in the result and, in large part, in the opinion of the court. However, I would add the following:

I do not concur in the opinion as it refers, on pages 798 and 799 thereof, to the presence or absence of "operative legal significance" given "to bad checks." I think it apparent, even by our decision, that bad checks may and frequently do have operative legal significance, not that sought for in this case by Champion, however. I would not rely on that as a reason for our decision.

I concur in Part III(B) of the opinion, not for the reason that the courts below were not clearly erroneous in their holdings that the events which took place here were not in the ordinary course of business or financial affairs, but because, as it recites, that "[w]e do not believe that Congress intended a bad check and subsequent payments to make it good to be viewed as in the ordinary course of affairs between two parties or made according to ordinary business terms." Also, as our opinion recites, I think making a bad check good must be considered "unusual action," thus taking such a transaction out of the ordinary course of business or financial affairs of the parties. To rely on the factual determination of the courts below in the circumstances present here may suggest that if the parties had gone through like factual situations on previous occasions in making bad checks good, a finding of ordinary course of business or financial affairs might have been sustained. I do not think that is the case.

**DIREX ISRAEL, LTD.; Direx, Incorporated, Plaintiffs–Appellees,**

v.

**BREAKTHROUGH MEDICAL CORPORATION; ZVI Porath; Avner Spector, Defendants–Appellants.**

No. 90–1498.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1990.

Decided Dec. 24, 1991.

As Amended Jan. 7, 1992.

Edward P. Henneberry, Howrey & Simon, Washington, D.C., argued (Alan M. Grimaldi, John R. Alison, Howrey & Simon, Washington, D.C., on the brief), for defendants-appellants.

John Mel Walker, Kirkland & Ellis, Washington, D.C., argued (L. Mark Wine, Robert S. Ryland, Kirkland & Ellis, Washington, D.C., Robert Friedman, Zur & Friedman, Ramat Gan, Israel, on the brief), for plaintiffs-appellees.

Before RUSSELL and WILKINS, Circuit Judges, and TILLEY, District Judge for the Middle District of North Carolina, sitting by designation.

## OPINION

DONALD RUSSELL, Circuit Judge:

This is an appeal from a grant of a preliminary injunction in favor of the plaintiffs in a trade secrets case. The subject of the controversy is a portable, relatively inexpensive medical device for dissolving kidney and gall stones without surgery.[1] The plaintiffs Direx, Inc., a California corporation, and its affiliate Direx, Ltd., an Israeli corporation (hereafter collectively referred to as Direx),[2] began, in 1987, to research the development of such a machine. They allege that the defendants Breakthrough Medical Corporation, a Delaware corporation with its principal place of business in Gaithersburg, Maryland (hereafter referred to as Breakthrough), its founder and president Zvi Porath, an Israeli citizen, Avner Spector, an Israeli citizen who was until February 1, 1989 the chief engineer of the plaintiffs, but who later became the engineer for Breakthrough, and Kopel Lifschitz, an Israeli citizen who was in charge of marketing for the plaintiffs from January 1987 until January 1989 when he was discharged, illegally appropriated and exploited the plaintiffs' trade secrets, and were using such trade secrets to manufacture, with intent to market, a machine competitive with the plaintiffs' product. The plaintiffs Direx sought to enjoin Breakthrough from these efforts and to require an accounting. Applying the hardship test formulated in *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977), the district court granted plaintiffs a preliminary injunction. The district court found that the balance of hardships, though not decidedly in favor of the plaintiffs nonetheless weighed in favor of the plaintiffs, and that it appeared that Direx had "clearly" shown the likelihood of success on the merits by the preponderance of the evidence. On that finding, the court granted interim relief in favor of Direx. The defendants appealed that decision. We stayed such injunction until the hearing of this appeal. We now reverse the grant of the preliminary injunction without prejudice to the right of the plaintiffs to renew

---

**1.** The district judge defined the machine more specifically: "[A] lithotripter, which is designed to, by extracorporeal shock generation transmitted through an aqueous medium into the human body, shatter various calcifications, in this case, renal calculi also perhaps at some juncture biliary calculi." (J.A. at 10.)

**2.** Dr. Moshe Ein–Gal, an Israeli citizen, is the founder and president of both.

such motion on the basis of any new or additional facts that may have occurred since the grant under review.

## I.

Before any party to this litigation entered the lithotriptic field, other researchers made significant advances in the technology of dissolving kidney and gall stones in the urinary or biliary tracts through the use of externally created electric shockwaves. Specifically, the German conglomerate Dornier Corporation (now Dornier Mercedes), a pioneer in the field of lithotriptic research, had manufactured a lithotripter which the United States Food and Drug Administration (FDA) approved for sale in December, 1984. Dornier's lithotripter required considerable space and gas and water connections, was immovable, and, more importantly, was quite expensive. Only larger hospitals could afford such a medical instrument or provide the facilities and personnel necessary for its operation. This left an unsatisfied need in the marketplace for the development of a smaller machine for use in clinics and smaller hospitals, which would require minimum space for operation and which would be easily portable, simple in operation, and saleable at a fraction of the price of the larger Dornier machine. Dr. Ein–Gal, who obtained a Ph.D. in electrical engineering from Stanford University, had been engaged for a number of years in developing advanced medical devices in the "Silicon Valley" area of California. He recognized and sought to take advantage of the opportunities for the production of such a small, relatively inexpensive lithotripter.

In 1983, Dr. Ein–Gal incorporated Direx as a California corporation. Sometime later he secured a corporate charter for Direx Israel, Ltd., with its principal place of business in Israel, for the purpose of developing and producing a reasonably priced, smaller and modular lithotripter. Progress on the device was slow at first, largely because the initial efforts were apparently financed and carried on solely by Dr. Ein–Gal. In 1985, Dr. Ein–Gal filed on behalf of Direx Israel an application for a research and development grant from the Israeli Government. On December 4, 1985, the Israeli Government issued approval for the first stage of a two-year funding program for research and development by Direx of the proposed small lithotripter. The program's financial allocation was in the range of $300,000, which was to include some compelled contribution by Direx.

Upon approval of a grant by the Israeli government, progress upon the Direx lithotripter began in earnest. Operations were established in what Dr. Ein–Gal described as a sort of "kitchen," or what Spector, whose involvement in the project is detailed hereinafter, described as

> a house, about 500 square feet small. The bedroom was EinGal's office; ... and the kitchen was the lab. There was nothing more to it. Direx stayed in that small house until mid–1987, after we sold the first few machines. In other words, the Tripter X1 was designed, developed and produced in two rooms and a kitchen.

(J.A. at 1742.) These facilities, though small, were adequate at the time, since the process on which Direx was working "involved," in the words of the district judge, "a fairly unsophisticated R & D effort." (J.A. at 11.)

Immediately after receiving approval of the grant, Dr. Ein–Gal interviewed Avner Spector, a graduate in mechanical engineering at Ben Gurion University, who had recently been released after six years from military service, where he had engaged in research on military hardware with some success. This research, according to Spector, "involved many of the same technologies and areas of electronics and physics that are involved in the development of sparkgap lithotripters...." (J.A. at 1781.) In this first interview, Dr. Ein–Gal told Spector, again according to Spector and without any contradiction by Ein–Gal, that he wanted to design an inexpensive sparkgap lithotripter, based to a large extent on the technology illustrated in the Dornier

lithotripter.[3] Dr. Ein–Gal obviously thought Spector was qualified to assist him in that endeavor, for, when he hired him, Spector was the only full-time employee of Direx other than Dr. Ein–Gal, and at that time he was given the office in the house where Direx and its operations were located right next to his (Dr. Ein–Gal's) own office. Spector's office also connected with Direx's laboratory. Dr. Ein–Gal explained to Spector that Direx had limited funds and was restricted in what it could pay Spector in cash at the time to $12 per hour. He said that payment would be supplemented by a share in the profits (to be measured by sales) if the project were successful. Spector accepted the offer. The oral agreement of employment was subsequently incorporated in a written contract, in which it was provided that, in addition to his pay at $12 per hour, Spector would receive a fixed percentage of all sales of Tripter X1. This contract also had a "Proprietary Disclosure and Non–Compete Agreement" under which Spector agreed "not to disclose to others any information (technical, business, legal or other) which has been received from Direx, Inc." (J.A. at 91.)

As we have said, activity on the project accelerated after the Israeli grant was approved and Direx employed Spector. The district judge found that "Spector worked very closely with Dr. Ein–Gal in developing the prototypes." (J.A. at 12.) Ein–Gal and Spector began their activity with the inspection of the Dornier lithotripter at the Hadassah Hospital in Jerusalem. The parties then proceeded with their research and development at the facility already described. Spector, it seems, was in immediate charge of the laboratory and the actual assembling of the "off-the-shelf" components which were included in Direx's lithotripter. By mid–1986—approximately six months after the accelerated effort had begun—Direx had produced a prototype Tripter X1 and had begun treating patients in clinical tests. The simplicity of the machine and its components is demonstrated

by its production cost of $15,000, even though the sale price of the machine was later fixed at $250,000 to $300,000. Direx obtained approval from the Israeli Government in early 1987 for the sale of its Tripter X1 in Israel and other areas, but not in the United States. It made its first commercial sale of Tripter X1 in mid–1987. At the time of the suit, it had sold some 100 machines at prices ranging from $250,000 to $300,000.

The United States, however, remained the untapped market where Direx's device was not approved for marketing and the one with the greatest sales potential. Direx determined to pierce this market. In 1988, it applied to the Federal Drug Administration and secured, as a preliminary matter essential to approval for sale in the United States, an Investigational Device Exemption for United States-based clinical trials of its machine. At the time of hearing on the motion herein, these clinical tests were complete. Direx anticipated that, upon completion of this investigation, it would receive, momentarily, approval for the sale of its device in the United States.

In 1988, the relations between Dr. Ein–Gal and Spector, however, began to deteriorate. According to Spector, the first problem arose when Dr. Ein–Gal told Spector that he (Dr. Ein–Gal) wanted to pay Spector his commissions outside of Israel by deposit in a Swiss bank. Spector assumed, according to his testimony, that this maneuver was intended to avoid Israeli taxes of some kind. He said he would accept payment in that way, but he made it clear that he would "declare the income in Israel as required." (J.A. at 1736.) This refusal on his part to participate in the proposed method of payment resulted in his judgment in a reduction of his responsibilities and his contact with distributors. Spector said he began to suspect too that he was being shortchanged in his commissions. He complained of delayed payment of his commissions to Dr. Ein–Gal, who told him he would be paid his commissions on Feb-

---

**3.** In his reply affidavit, Dr. Ein–Gal confirmed that the Direx and Dornier machines both rely on basic lithotripsy theory.

ruary 1 and that he "would be pleased with the amount." (J.A. at 1741.) But on February 1, 1989, he was told by Direx's comptroller that Dr. Ein–Gal had instructed him (the comptroller) not to pay him any commissions. The next day, Spector said he told Dr. Ein–Gal that his contract had been breached, and he was quitting. Spector's connection with Direx accordingly terminated formally on February 2, 1989.

In the meantime, the defendant Breakthrough had been chartered under the laws of Delaware in September, 1988, after Direx had begun aggressive marketing of its Tripter X1 in the areas where it had been approved for marketing. The president and principal stockholder of Breakthrough was Zvi Porath, an Israeli citizen living at the time in Maryland. According to his own resume, he was Israel's representative to the International Monetary Fund in Washington in the 70s, and, for about ten years between 1976 and 1985, was chief economist and Financial Strategist of Elscint Ltd., a high technology company located in Israel and engaged in the development, manufacturing, and marketing internationally of various medical devices. For the years since 1985, he has been a consultant specializing in the financing of emerging companies. Lifschitz earlier introduced Porath to Dr. Ein–Gal as one who could be of assistance in a proposed public offering of stock by Direx. Porath and Dr. Ein–Gal were unable to fashion a viable offering, and the project was abandoned. During the discussion relating to the proposed stock offered, Direx made certain disclosures of financial and marketing information but Porath never requested disclosure of Direx's technology, and no such disclosure occurred.

There is some dispute as to whether Porath formed Breakthrough for the sole purpose of attempting to break into the market for a simple, inexpensive lithotripter such as Direx was marketing. However, this objective was a manifest and primary intention of Porath. Moreover, a number of other companies, as identified by both Spector and Kramer, an expert witness for Breakthrough, in their affidavits, had also been formed for the same purpose and were engaged at the time in the development and later sale of such a device.

Shortly after Breakthrough was chartered, Lifschitz, whom Dr. Ein–Gal discharged in a dispute over collections, introduced Spector to Porath. Apparently Lifschitz knew of Spector's dissatisfaction at Direx. There is circumstantial evidence that in late 1988, Porath, Spector, and Lifschitz met on one or more occasions. It is undisputed that after he, on February 1, 1989, left Direx, Spector joined Porath in the latter's efforts to develop a lithotripter to accomplish the same purpose as Direx's Tripter X1. Spector's contract with Breakthrough was formalized in a written contract dated April 17, 1989.

After joining Breakthrough, Spector, along with a force of additional employees, some of whom had substantial technological experience and education began work at Breakthrough's plant in Gaithersburg, Maryland on the production of a lithotripter. In August, 1989, little more than seven months after it began its work, Breakthrough developed its first production model lithotripter. At the time of our hearing, Breakthrough had not sought an Investigatory Exemption from the FDA for clinical testing in the United States, and the product is not currently approved for marketing in this country. Beyond this, Breakthrough's ability to ship the product abroad has been hindered as a result of proceedings by United States Customs. In short, at the time of the application by Direx for a preliminary injunction, Breakthrough could not sell its product in the United States, and, as a result of the Customs' embargo, was unable to ship abroad its device for sale in foreign markets.

When Dr. Ein–Gal learned of Spector's connection with Breakthrough, he, through Direx, filed an injunctive action in the Israeli courts on June 26, 1989, against Spector, for the purpose of prohibiting him from "giving to others any trade secrets which are particular to the plaintiffs." (J.A. at 75.) Both Direx and Spector agreed to an order which an Israeli court entered in the action. The order prohibited Spector from engaging "in the design or

production of devices which are based on the know-how of plaintiffs."[4] (J.A. at 76.) However, the order expressly permitted Spector "to engage in the field of medical devices for dissolving kidney and gall stones, providing that with respect to a device for dissolving kidney and gall stones it will not be based on the above-mentioned particular know-how of the plaintiffs." (J.A. at 75.) The order did not identify any "trade secrets" which were "particular to" Direx; and, so far as the record shows, Spector continued his connection with Breakthrough without any attempt on Direx's part to assert in the Israeli action that Spector was acting in violation of the Israeli injunction.

On November 7, 1989, Direx filed this suit in the United States District Court for Maryland seeking both temporary and permanent injunctive relief "to enforce" what it alleged was "its right to protect its trade secrets and to enjoy the benefits of the technology it worked hard to develop and which Porath, Spector, and Lifschitz know full well they have unlawfully stolen." (J.A. at 48.) After some discovery, the plaintiffs moved for a preliminary injunction. The parties filed affidavits pro and con on the motion, and the district court received some testimony. After briefing and oral argument on the issues, the district judge granted a limited preliminary injunction in favor of the plaintiffs.[5] The case was subsequently re-assigned to another district judge, who denied a motion for reconsideration and refused to stay the injunctive order pending appeal. On defendants' application to this court, we granted a stay of relief pending disposition of the appeal from the grant of the preliminary injunction. The court now reviews the district court's grant of preliminary injunctive relief.

---

**4.** "Know-how" is apparently synonymous with our term "trade secrets."

**5.** The injunction did not prohibit Breakthrough from manufacturing its machines, but rather prohibited Breakthrough from selling the machines it manufactured. This purported concession to Breakthrough was more in the nature of a mirage than a substantive concession.

## II.

The district judge relied upon a construction of *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977), for guidance as to the legal standard to apply in considering Direx's application for preliminary injunctive relief. *Blackwelder* provides that the "first step" to be taken by the court in connection with a request for interim relief is

> to balance the "likelihood" of irreparable harm to the plaintiff against the "likelihood" of harm to the defendant; and if a *decided* balance of hardship should appear in plaintiff's favor, then ... "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."

550 F.2d at 195 (emphasis added). However, as the district judge observed, the Fourth Circuit in *Blackwelder* also noted that if "the plight of the defendant [is] not substantially different from that of the plaintiffs," that is, if there is no imbalance of hardship in favor of the plaintiff, then "the probability of success begins to assume real significance," and interim relief is more likely to require a clear showing of a likelihood of success.[6] *Id.* n. 3 (citing *Davis v. Crown Petroleum Corp.*, 483 F.2d 1014 (4th Cir.1973)).

The district judge, in utilizing this formulation of the *Blackwelder* test, proceeded to state his assessment of the harm resulting to Direx from a denial of preliminary injunction relative to the harm resulting to Breakthrough from the grant of such injunctive relief. The district court found that

---

**6.** The district judge summarized this point as stated by *Blackwelder* thus:

The Court [in that case] said that as the balance of injury moves on the continuum away from a very clear irreparable injury to the plaintiff and relatively *de minimis* harm to the defendant towards the other end of the scale, then the likelihood of success to be shown should increase.

(J.A. at 16.)

[i]f the defendant B.M.C. is allowed to continue in the world marketplace and is allowed to enter the United States marketplace, there will, in fact, be irreparable injury to the plaintiffs ... because the injury here will not be adequately able to be compensated for by an award of damages in view of the fact that the unique competitive advantage to be gained from being first on the market and having that first on the market recognition is in the nature of a good will kind of thing which was specifically addressed by the *Blackwelder* court on page 197 as the kind of thing that is incapable of quantification and thus is incapable of adequate recompense in damages at least looking at it from the case in terms of what irreparable injury means.

(J.A. at 17.) In short, the district court said, "there is certainly a threat of irreparable injury in terms of Direx's market position." (J.A. at 18.) On the other hand, the district court determined the harm to Breakthrough was that

a decree [in Direx's favor] would stop the defendant from selling its machine, selling its production overseas and domestically would have a very great impact on the defendant and the defendant does not ... at the moment it appears that B.M.C.'s business is at a standstill, because they can't sell in foreign markets since they don't have FDA export approval, they can't sell domestically, since they don't have FDA domestic marketing approval. So they can't sell anything.... That is right at the moment. Of course, I realize that it is subject to change if the FDA changes its position.

(J.A. at 18–19.)

After articulating his view of the irreparable harm that Direx might suffer if interim relief were denied and the injury that would be inflicted upon Breakthrough if the interim relief were granted, the district judge stated he "would agree that the balance here is not entirely one-sided. The balance does not favor the defendant. It, in my judgment, favors the plaintiffs, but not overwhelmingly in terms of balancing the hardships." (J.A. at 20.) Immediately after such statement, however, the district judge elaborated upon his findings as follows:

One of the reasons that I would say it favors the plaintiff in terms of balancing the hardships is that, I think, and this is a little hard to divorce from the merits of the case as to whether there was misappropriation of trade secrets, but I certainly think the timing of the events, I certainly think that the similarity of components and many other factors would at least constitute strong circumstantial evidence that there had been conduct on the part of B.M.C. that brought it into the marketplace that was not fair and that, under Maryland law, Space Aero and the Head Ski case, would be capable of being the subject of either a permanent injunction or an award of damages.

(J.A. at 20–21.) The preceding statement demonstrates that the district court based its finding that the balance of hardship tilted in the plaintiff's favor largely on the court's determination that plaintiff enjoyed a likelihood of success: "And here, there has been enough evidence adduced to convince me that given the relative balancing of harm, which, as I have said does not greatly favor the plaintiff, it does favor the plaintiff in that there is enough of a showing of likelihood of success." (J.A. at 27.) We think it is manifest that the district judge found the hardship balance *only* because of his feeling that the likelihood of success favored the plaintiff.

In addressing the plaintiff's likelihood of success with a "continuum" standard which the district court earlier described, the district judge determined that the plaintiff, to make the required showing, needed to establish "clear evidence that, given the balance as [he] looked at it here, there is a likelihood of success on the part of the plaintiffs if the case ultimately goes to the jury to determine the facts as to whether trade secrets are incorporated." (J.A. at 24.) The district court recognized that in *Mycalex Corp. v. Pemco Corp.*, 159 F.2d 907, 912 (4th Cir.1949), we had said that such showing should be "clear and convinc-

ing," but he dismissed that standard with the comment,

I don't have the foggiest notion what that means. "Rather clear and convincing" is not a burden of proof known to me in the law, very frankly. It might have been known to Dean Dobie, who wrote that opinion, but that has not come down to me. It is not a separate standard.[7]

(J.A. at 23–24.) The district judge proceeded to affirm that,

because of the relative balancing and the fact that it is not clearly one-sided in favor of the plaintiff, more than just a bare showing of presenting grave questions [is required]. I think this case requires something more along the lines of a clearer showing that the plaintiff could prevail by a preponderance of the evidence and that is more than just a showing that grave questions are presented.

(J.A. at 21.) The district judge concluded that, with respect to the standard of proof:

Looking at it today, based on all of the evidence that is before the Court, not just what was said here in court, but also the affidavits of all of the experts, there certainly is sufficient evidence from which a reasonable fact finder could find by a preponderance that the B.M.C. machines initially and even today use pro-

prietary technology that was derived from Direx in violation of law of Israel and of the United States governing proprietary information and of Spector's contractual obligation.

In this vein, I am sort of using, although I haven't seen any cases that do this, I am sort of using the Supreme Court's recently developed summary judgment standard, that is, were the case in a directed verdict posture, is there enough to go to the jury? That maybe is the right standard to use in a case like this, where the balancing test is not so clearly one-sided.

(J.A. at 26–27.)

Adopting as the standard for establishing the likelihood of success on the merits a standard similar to that applicable to a motion for summary judgment under Fed. R.Civ.P. 56—a standard which the district judge earlier embraced during testimony for a hearing on this motion for interim relief [8]—the district judge undertook in effect to discover whether there existed "a genuine issue as to any material fact" by reviewing what it described as "a battle of the experts." (J.A. at 24.) The district court noted that the plaintiff's expert, Dr. Lewin, stated that "although the individual components of these machines, both Direx

---

**7.** Contrary to the district judge's statement, "clear and convincing" is a well-recognized standard in the proof scheme employed by our nation's courts. In *Addington v. Texas,* the Supreme Court identified the "three standards or levels for different types of cases" as follows: "preponderance of the evidence" is the lowest level of proof, and is to be applied in the "typical civil case involving a monetary dispute"; "beyond reasonable doubt" is the highest level of proof, and is to be applied "in a criminal case"; and "clear and convincing" is an "intermediate standard," which is to be applied in cases where the interests at stake "are deemed to be more substantial than mere loss of money." 441 U.S. 418, 423–24, 99 S.Ct. 1804, 1807–08, 60 L.Ed.2d 323 (1979). This intermediate level of proof, the Supreme Court added, is "no stranger in the civil law." *Id.* at 424, 99 S.Ct. at 1808. A relevant treatise, for example, defines "clear and convincing" as meaning "highly probable." 9 J. Wigmore Evidence § 2498 (3d ed. 1940). The Supreme Court also recognized the "clear and convincing" standard of proof quite recently in *Pacific Mutual Life Ins. Co. v. Haslip,* — U.S. ——, 111 S.Ct. 1032, 1046 n. 11, 113

L.Ed.2d 1 (1991). *See also Alexander v. Warren Ark. School District,* 464 F.2d 471, 474 (8th Cir. 1972) ("Certainly 'clear and convincing' demands more than just a preponderance of the evidence"); *Buildex, Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988). Congress also uses the term "clear and convincing" in many statutes, *e.g.,* 36 U.S.C. § 283. Moreover, in *Addington v. Texas,* the Supreme Court identified at least 20 states which employ the "clear and convincing" standard of proof. 441 U.S. at 431–32 n. 6, 99 S.Ct. at 1812 n. 6.

**8.** During examination of Dr. Ein–Gal by counsel for the defendants, counsel inquired about the similarities and differences of the capacitors used by Direx and Breakthrough in their respective machines. The district judge cut off such inquiries, declaring, "You know, now we [are] getting into the very details on his trade secrets; and, as I said, the question here before the court is not to determine as a matter of fact the exact parallel of one machine to another, *but just whether there are questions raised."* (J.A. at 1969) (emphasis added).

and B.M.C., are essentially off the shelf items, it is the arrangement of those components and the result produced which is unique in the Direx and B.M.C. machines to each other to the exclusion of other machines on the market." Thus the district court observed, "There is certainly sufficient evidence from which a reasonable fact finder could find by a preponderance that the B.M.C. machines initially and even today use proprietary technology that was derived from Direx in violation of law...." (J.A. at 26.) The district court further observed that Dr. Zahn's affidavit opposed Dr. Lewin's affidavit, and that Dr. Zahn would likely testify at trial in a fashion consistent with the affidavit. Based on its comparison of the affidavits of two experts, the district court opined:

> Given all of the circumstances, the balance of hardships and the likelihood of success on the merits, that the equities favor allowing Direx to continue to maintain its predominant market position with regard to this and to continue to be able to market the device at a price that does not have to be cut in order to meet B.M.C.'s direct price competition.

(J.A. at 28A.)

With regard to the final factor of the public interest, the district judge engaged in a balancing process between the public interest in "free competition in the marketplace" (J.A. at 28), a circumstance favoring the defendants, and the public interest in "promoting useful developments in science and technology by giving protection to proprietary information." *Id.* The district judge apparently concluded, though he did not so state, that the public interest favored the plaintiff's position.

Such was the decision of the district court now presented for this court's review.

## III. The Applicable Law

The grant of preliminary injunctions in diversity cases, as well as those of original jurisdiction, is subject to federal standards. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir.1989); 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 2943 (1973). Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied "only in [the] limited circumstances" which clearly demand it. *Instant Air Freight*, 882 F.2d at 800; *Buffalo Courier–Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 59 (2d Cir.1979), quoting *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292, 293 (3d Cir.1940). However, federal courts have developed two distinct standards to govern the grant of such relief. One of these standards, often referred to as the "traditional" test, is the "likelihood-of-success" standard; the other standard is the "hardship balancing test." The essential difference between these two standards is that while the first begins its inquiry with the determination of "likelihood of success" on the merits and proceeds to consider in sequence other factors embraced within the standard, the second begins by balancing the harm or injury imposed on the plaintiff in the event relief is denied against the harm to the defendant if the relief is granted, and on the basis of such balancing proceeds to determine the degree by which a "likelihood of success" on the merits must be established before relief may issue. Illustrative of the first standard is *Northern Alaska Environmental Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986); illustrative of the second standard is *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 195 (4th Cir.1977). This circuit has consistently followed the "hardship balancing test" as stated in *Blackwelder*.[9]

---

9. Other cases for the Fourth Circuit involving grants of interim injunctive relief are: *Todd by Todd v. Sorrell*, 841 F.2d 87 (4th Cir.1988); *James A. Merritt & Sons v. Marsh*, 791 F.2d 328 (4th Cir.1986); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048 (4th Cir. 1985); *Dan River v. Icahn*, 701 F.2d 278 (4th Cir.1983); *Telvest, Inc. v. Bradshaw*, 697 F.2d 576 (4th Cir.1983); *North Carolina Ports Auth. v. Dart Containerline, Ltd.*, 592 F.2d 749 (4th Cir. 1979); *Johnson v. Bergland*, 586 F.2d 993 (4th

The factors to be considered under the *Blackwelder* test have recently been stated in *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 359 (4th Cir.1991):

> The standard for preliminary injunctions is established in this Circuit by *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189 (4th Cir.1977). *Blackwelder* clarified that a hardship balancing test applies to determine the granting or denial of a preliminary injunction. *See L.J. By and Through Darr v. Massinga*, 838 F.2d 118 (4th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 805 (1989). Four factors must be considered:
>
> > (1) the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied,
> >
> > (2) the likelihood of harm to the defendant if the requested relief is granted,
> >
> > (3) the likelihood that the plaintiff will succeed on the merits, and
> >
> > (4) the public interest.
>
> *Massinga*, 838 F.2d at 120. The irreparable harm to the plaintiff and the harm to the defendant are the two most important factors.

Further, the "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Technical Publishing Co. v. Lebhar–Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir.1984); *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir.1983).

The "likelihood of irreparable harm to the plaintiff" is the first factor to be considered in this connection. We naturally begin our analysis with that issue because " '[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' " *Samson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 951–52, 39 L.Ed.2d 166 (1974) (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988 (1959)). The applicability of this principle has often been affirmed in cases involving motions for preliminary injunctions. *See Gelco Corp. v. Conniston Partners*, 811 F.2d 414, 418 (8th Cir.1987) (a failure to make such "a clear showing is

by itself a sufficient ground upon which to deny a preliminary injunction"); *Norlin Corp. v. Rooney, Pace Inc.*, 744 F.2d 255, 260 (2d Cir.1984) ("a preliminary injunction will not issue without a showing of irreparable harm"). We reaffirmed this requirement of a clear showing of irreparable harm as a condition for the grant of a preliminary injunction in *Rum Creek*: "To succeed the Company must show that it will sustain irreparable harm without a preliminary injunction. The 'balance of hardship' test does not negate the requirement that the [movant] show some irreparable harm." 926 F.2d at 360. Moreover, the required "irreparable harm" must be "neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989); *see ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.' "). And this requirement that the "clear showing" of irreparable harm to be suffered by the plaintiff from a denial of the relief must be both "actual" and "immediate" was adopted by us in our decision in *Dan River, Inc. v. Icahn*, 701 F.2d 278, 284 (4th Cir.1983), where Judge Murnaghan wrote:

> Weighing harms is no simple task. Critical to the weighing process here, though, is the simple fact that Dan River faces no *immediate* threat of irreparable harm. Under the circumstances, we cannot conclude that the balance-of-hardship favors management.

(emphasis added).

If it should be found that the plaintiff had made a "clear showing" of irreparable injury absent preliminary injunctive relief, the *next* step then for the court to take is "to balance the 'likelihood' of irreparable harm to the plaintiff [from failure to grant interim relief] against the 'likelihood' of harm to the defendant [from the grant of such relief]...." *Blackwelder*, 550 F.2d at 195. "If, after balancing those two factors [*i.e.*, irreparable harm to plaintiff against

Cir.1978); *Conservation Council v. Costanzo*, 528 F.2d 250 (4th Cir.1975).

harm to the defendant], the balance 'tips decidedly' in favor of the plaintiff, a preliminary injunction will be granted if 'the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' As the balance tips away from the plaintiff, a stronger showing on the merits is required." *Rum Creek*, 926 F.2d at 359 (citations omitted). Other decisions and texts have stated the same principles in somewhat different language. *See James A. Merritt & Sons, Inc. v. Marsh*, 791 F.2d 328, 330 (4th Cir 1986) ("When the balance of harms decidedly favors the plaintiff, he is not required to make a strong showing of a likelihood of success...."); *Maryland Undercoating Co., Inc. v. Payne*, 603 F.2d 477, 481 (4th Cir. 1979) ("The need for plaintiff to show likelihood of success on the merits increases as the probability of irreparable injury to plaintiff without an injunction decreases."); *Sea Containers, Ltd. v. Stena*, 890 F.2d 1205, 1208 (D.C.Cir.1989) (substantial likelihood of success on the merits required); *Kowalski v. Chicago Tribune Co.*, 854 F.2d 168, 170 (7th Cir.1988) ("A request for a preliminary injunction is evaluated in accordance with a 'sliding scale' approach: the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction."); *Dollar Rent A Car v. Travelers Indemnity Co.*, 774 F.2d 1371, 1374–75 (9th Cir. 1985) ("The moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor."); *Maxim's, Ltd. v. Badonsky*, 772 F.2d 388, 391 (7th Cir.1985) (the judge must "require a fairly clear-cut probability of success if he did not find that harm to the plaintiff outweighed harm to the defendant *to a significant degree*" (emphasis added)); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1270 (6th Cir.1985) (If the balance does not tip decidedly, there must be "a strong probability of success on the merits."); *see also Mycalex Corp. v. Pemco Corp.*, 159 F.2d at 912 ("clear and convincing" proof of likelihood of success required). The author in 2 McCarthy on Trademarks and Unfair Competition, § 30.-16, at 485–86 (2d ed. 1980), put the standard by which "likelihood of success" on the merits must be established when the hardship balance does not tip "decidedly" or "significantly" in favor of the plaintiff as

> a probability (not mere possibility) of success of the ultimate trial on the merits. "Probability of success" implies that the plaintiff must have a very clear and strong case. Some courts have stated this in terms by the maxim that in considering preliminary injunctive relief "to doubt is to deny." That is, if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied.

■ This discussion clearly shows that the balance of harm evaluation should precede the determination of the degree by which the plaintiff must establish the likelihood of success on his part. *See Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir.1982) ("the likelihood of success that need be shown [for a preliminary injunction] will vary inversely with the degree of injury the plaintiff will suffer absent an injunction"); *Benda v. Grand Lodge*, 584 F.2d 308, 315 (9th Cir.1978), *cert. denied*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979) ("If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly."). As the court said in *American Hospital Ass'n. v. Harris*, 625 F.2d 1328, 1331 (7th Cir.1980), "[t]he required showing of probability of success on the merits 'varies with the quality and quantum of harm that [the moving party] will suffer from the denial of an injunction.'" And because of this essential correlation, we in *Blackwelder* declared that the "district court below erred in holding that plaintiff must first show 'likelihood of success' in order to be entitled to preliminary relief. Instead,

the first step in a Rule 65(a) situation is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant...." 550 F.2d at 195. Until that balance of harm has been made, the district judge cannot know how strong and substantial must be the plaintiff's showing of "likelihood of success."

■ The final factor that a plaintiff must show as a prerequisite for preliminary injunctive relief is the "public interest," which in this case balances free competition in the marketplace with the warrant for monopoly protection of a trade secret, if one be found.

Such are the standards for the grant of injunctive relief. The district judge found that Direx met all four factors required for interim injunctive relief. The defendant has appealed that decision.

### IV.

■ We next address the standard of review to be applied here. The commonly stated rule is that the grant or denial of relief is reviewable under the abuse of discretion standard. *Merrill Lynch, Pierce, Fenner & Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir.1985); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir.1979). "Abuse of discretion" is a legal term of art; it is not a wooden term but one of flexibility, dependent on the type of case in which it is to be applied and the posture of the case when it arises. Because of this, many courts have expressed dissatisfaction with the term "abuse of discretion" as a standard for appellate review in a case such as this. One court, which has voiced such dissatisfaction, explained that the term "abuse" has "pejorative connotations not here appropriate.... Perhaps 'misuse' is milder. What we mean when we say that a court abused its discretion, is merely that we think that [the court] made a mistake." *Pearson v. Dennison*, 353 F.2d 24, 28 n. 6

(9th Cir.1965).[10] Particularly where the appeal is from a grant of preliminary injunction, which represents the exercise of a "very farreaching power, never to be indulged in except in a case clearly demanding it[,]" the standard of appellate review must not be reduced to "the largely meaningless ritual" of the typical "abuse of discretion" standard. *Buffalo Courier*, 601 F.2d at 59; *see Weinberger v. RomeroBarcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982). Judge Craven in *Blackwelder* clearly recognized this and warned against any normal application of the cliche "abuse of discretion" in an appeal of a grant of interim injunctive relief. He wrote:

When the grant or denial of interim injunctive relief is reviewed, it is simplistic to say or imply, as we sometimes do, that it will be set aside only if an abuse of discretion can be shown. For there is, of course, the possibility that the court below has either failed to exercise its discretion in some respect or else exercised it counter to established equitable principles. A judge's discretion is not boundless and must be exercised within the applicable rules of law or equity. And our review of the lower court's application of the law is not limited by the same "clearly erroneous" rule which restricts our review of its findings of fact under Rule 52(a).

550 F.2d at 193 (citations omitted). In his article *Indiscretion about Discretion*, 31 Emory L.J. 747, 773 (1982), Judge Friendly expressed much the same word of caution as Judge Craven had earlier in *Blackwelder*. He said:

Perhaps the most important area where parroting the discretion phrase is likely to lead to wrong decisions is the review of the grant or denial of preliminary injunctions.

Drawing upon *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190,

---

**10.** For a full discussion of criticisms of the phrase "abuse of discretion" as a limitation on appellate review, see Judge Friendly's opinion in *Buffalo Courier-Express, Inc. v. Buffalo Eve-ning News, Inc.*, 601 F.2d 48, 59 (2d Cir.1979), and Judge Posner's opinion in *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 388–90 (7th Cir.1984).

1197 (2d Cir.1971), the court in *Roland,* 749 F.2d at 389, said:

> The exercise of a power so far-reaching ought to be subject to effective, and not merely perfunctory, appellate review. "Congress would scarcely have made orders granting or refusing temporary injunctions an exception to the general requirement of finality ... if it intended appellate courts to be mere rubber-stamps save for the rare cases when a district judge has misunderstood the law or transcended the bounds of reason."

Finally, in *Rum Creek,* giving consideration to the "far-reaching" and "extraordinary" character of grants of preliminary injunctions, and giving weight to the critical comments on the "abuse of discretion" standard in preliminary injunction cases, we declared the proper standard of appellate review in preliminary injunction cases:

> Of course, a judge's discretion in granting or denying relief is not boundless and an appellate court will overturn a district court's decision if made under an improper legal standard. Factual findings under the abuse of discretion standard are reversed only if " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' "

926 F.2d at 358 (citations omitted). This rule is substantially the one recommended by Judge Friendly in *Buffalo Courier* and Judge Posner in *Roland.* It is not a rule of perfunctory appellate review but one of careful scrutiny.

## V.

### A.

In reviewing the decision below under the standards established for this cause, we begin by looking to the first requirement which must be satisfied if preliminary relief is to be granted: Has the plaintiff made a "clear showing" that it will suffer an immediate irreparable harm were such relief not granted it? The district court held that Direx had met this burden. It based this conclusion on its finding that it was necessary to grant Direx a preliminary injunction because, "if the defendant B.M.C. [Breakthrough] is allowed to continue in the world marketplace and is allowed to enter the United States marketplace," such relief was required in order for Direx "to maintain its predominant position" in the low-cost tripter field and "to be able to market [its] device at a price that does not have to be cut in order to meet [Breakthrough's] direct price competition." (J.A. at 17, 28A.) It will be observed that the district court's finding is based on two assumptions: the first of these assumptions is that Breakthrough is competing with Direx in the world marketplace; the second is that Breakthrough may be allowed to enter the United States market. The problem with this reasoning is that neither assumption is presently correct.

■ First of all, Breakthrough is not competing with Direx in the world marketplace for low-cost tripters. Breakthrough is completely immobilized, so far as competing with Direx is concerned. The Customs Service has issued an order denying Breakthrough the right to export its machine. Breakthrough's sole manufacturing plant is in the United States. Denial of the right to export its machine from its plant in the United States closes the world market for tripters to Breakthrough. It is true Customs might raise its embargo on Breakthrough's product at any time. Such result, however, seems unlikely in the reasonable future. The proceedings before Customs have been extended, and there is no evidence suggesting the likelihood of a quick conclusion. Actually, the proceedings seem to have broadened, giving rise to an assumption that any resolution of the issue will not be quickly achieved. Obviously, there is no immediate threat to Direx's primacy in the world market nor is there an opportunity for Breakthrough in the world marketplace to undercut Direx's price for its low-cost tripter.

■ Similarly, there is no likelihood within a reasonably foreseeable time within which Breakthrough will be "allowed" to market its machine in the United States. In order to market its product in the United States, Breakthrough must secure the ap-

proval of the FDA. Securing approval begins with the filing of an Investigatory Exemption to conduct clinical tests within the United States and the issuance of such Exemption. After securing the Exemption approval, the applicant must conduct extensive clinical tests. The FDA, after reviewing the results of these tests, may grant or deny approval of the machine for marketing in the United States. It is manifest that approval for marketing in the United States is a fairly extensive process which can continue over a substantial period of time. Breakthrough has not even taken the first step in this extensive process of obtaining approval for its marketing in the United States. It has not applied for an Exemption approval, nor has it begun any clinical tests of its machine. Any prospect of Breakthrough's securing market approval in the United States are at the moment remote. There certainly is no present or reasonably anticipated threat that Breakthrough will be able to market its product in the United States.

It accordingly follows that there is no present prospect that Breakthrough will threaten the "predominant position" of Direx in the lowcost tripter field either abroad or in the United States. The district court recognized this when it said:

Of course, at the moment it appears that [Breakthrough's] business is at a standstill, because they can't sell in foreign markets since they don't have FDA export approval; they can't sell domestically since they don't have FDA domestic marketing approval. So they can't sell anything.

They can make them [*i.e.*, their machine], but they can't sell them. That is right at this moment. Of course, I realize that is subject to change if the FDA changes its position....

At the moment, they [Breakthrough] are not distributing anything. But I realize that is subject to change; and, looking at it over the long haul, taking into account the fact that this case is unlikely to be reached for trial on the merits since a jury trial has been prayed—I can't advance the hearing under 65(A)(2) because somebody asked for a jury trial, ...

maybe both sides did—so, you know, we have got to have a jury look at all of this and sort it out. We are talking about at least a year down the road, maybe two or three years down the road.

(J.A. at 18–19.)

█ In essence, then, the district court found present irreparable harm in favor of Direx, even though it recognized that there was no present threat of such harm, because maybe "at least a year down the road, maybe two or three years down the road," there will arise a possible need for a preliminary injunction. We are not persuaded by such reasoning that there is a present or immediate need for preliminary relief in favor of Direx. By the district court's own finding, any harm to Direx in this case is at this time problematical and uncertain. Remembering that preliminary injunctions are "extraordinary remedies" involving the exercise of "very far-reaching power" to be granted only "sparingly" and "in limited circumstances," the grant of such relief in this case, where the harm is admittedly not present or immediate but merely problematic, conditioned on possible future events, would seem contrary to our stated rule: A plaintiff, seeking preliminary relief, must show the present threat of irreparable harm. *See Dan River.* The district court should have dismissed the motion for preliminary relief because the plaintiff failed to establish that the denial would result in present irreparable harm.

### B.

█ Moreover, the district court failed to apply properly the hardship test in this case. Under that test, the hardship to be sustained by the plaintiff, if the preliminary injunction is not granted, is to be balanced against the harm to be suffered by the defendant. Only if the balance tilts "decidedly" in favor of the plaintiff is a right to preliminary injunctive relief warranted. The district judge recognized this statement of the hardship test, and it found that, while not "one-sided," the balance did favor the plaintiff. But it did not arrive at this conclusion by balancing the relative

harm to the two parties. Direx was subjected to no present harm by the defendant because, as previously stated, Breakthrough could not market its machine in competition with Direx's machine anywhere in the world. Likewise, Breakthrough's inability to market its machine and to compete with Direx was not due to anything Direx had done. It was the inability of Breakthrough to satisfy the requirements of Customs and its failure to initiate proceedings for FDA approval of its machine for marketing domestically that caused its harm. Thus, there is an absence of present hardship suffered by either Direx or by Breakthrough, and the hardship test is not met by Direx, on whom the burden of establishing it rests. The district judge recognized this, and after stating that the hardship balance favored Direx, he declared that he arrived at this conclusion because of his decision on the merits, that is, upon the likelihood of success on the part of Direx. This fact appears clear in the statement of the district judge as set forth heretofore. In short, the district judge found that the hardship balance favored Direx not because Direx was likely to suffer harm if the injunction was not granted (which it did not), but because he found that, in his opinion, Direx was likely to prevail on the merits. This confusion of the hardship balance with the likelihood of success was clear error in the application of the hardship test.

The hardship balance and the likelihood of success determination are separate, sequential steps in the application of the hardship test. *Blackwelder* makes it plain that the balancing of hardships should precede any consideration of the likelihood of success. Indeed, Judge Craven in that case said the district court had erred by considering the likelihood of success before completion of the hardship balance itself. *See supra* pp. 814–15. And the reason for this statement is easy to understand. The hardship test, by its very nature, is to precede the consideration of the likelihood of success, since the outcome of the hardship test fixes the degree of proof required for establishing the likelihood of success by the plaintiff. If the hardship balance tilts sharply and clearly in the plaintiff's favor, the required proof of likelihood of success is substantially reduced. Similarly, if the hardship to plaintiff is minimal or non-existent—as it certainly is in this case-then the burden on the plaintiff to establish likelihood of success on the merits becomes considerably greater. The likelihood of success determination is to proceed only after the hardship balance itself had been resolved. It is obvious error to resolve the hardship test by including in it the likelihood-of-success test. The district court erred in failing to recognize this and in confusing the hardship balance test and the likelihood-of-success factor.

### C.

██ We are of the opinion that the district judge also erred in the standard he adopted for resolving whether there was a strong showing of likelihood of success on the merits. The standard, as stated by the district judge, was:

> I think that this case requires, because of the relative balancing and the fact that it is not clearly one-sided in favor of the plaintiff, more than just a bare showing of presenting grave questions. I think this case requires something more along the lines of a clearer showing that the plaintiff could prevail by a preponderance of the evidence and that is more than just a showing that grave questions are presented.

(J.A. at 21.) But the district judge thereafter became somewhat vague and confusing on the proof of likelihood of success required under the standard for preliminary relief. He dismissed out of hand the idea that the proof must be "clear and convincing," a phrase used by us as the standard for injunctive relief in *Mycalex Corp. v. Pemco Corp.,* 159 F.2d 907, 912 (4th Cir.1947). He incorrectly found that there was no such standard of proof as "clear and convincing." *See supra* note 7. He said that the standard of proof is that of "whether the evidence could show by a preponderance, and that would be the standard ultimately to be decided." (J.A. at 22.) He then sought to clarify this lan-

guage, saying, "I am talking about whether a jury would award damages; and, a jury would determine the factual issues on this under the Supreme Court's recent case that overruled the Fourth Circuit on the effects of equitable fact finding on a jury trial." [11] (*Id.* at 23.) Finally, he declared as the proper standard required for proof of likelihood of success in this connection:

> Now, of course, the bottom line question is whether the evidence could show by a preponderance, and that would be the standard ultimately to be decided. It is by a preponderance of the evidence. I don't think it is clear and convincing evidence in a trade secret case any more than it is in any other civil case. It is not a fraud type thing. I think it is preponderance.

(*Id.* at 22.) And in applying that standard, he said:

> Looking at it today, based on all of the evidence that is before the court, not just what was said here in court, but also the affidavits of all of the experts, there certainly is sufficient evidence from which a reasonable fact finder could find by a preponderance that the B.M.C. machines initially and even today use proprietary technology that was derived from Direx in violation of law of Israel and of the United States governing proprietary information and of Spector's contractual obligation.
>
> In this vein, I am sort of using, although I haven't seen any cases that do this, I am sort of using the Supreme Court's recently developed summary judgment standard, that is, were the case in a directed verdict posture, is there enough to go to the jury? That maybe is the right standard to use in a case like this, where the balancing test is not so clearly one-sided.
>
> In any event, that is a higher test, I think, than the bottom line test required under *Blackwelder*. And here, there has been enough evidence adduced to convince me that given the relative balancing of harm, which, as I say, does not

greatly favor the plaintiff, it does favor the plaintiff in that there is enough of a showing of likelihood of success.

(*Id.* at 26–27.)

We think the standard adopted by the district judge to determine whether the plaintiff would prevail on the merits is contrary to the whole body of precedent in this area. The decisions invariably state the standard of proof required in a case such as this where the hardship balance does not tilt "decidedly" in plaintiff's favor as a strong showing of likelihood of success, *Dan River, Inc.*, 701 F.2d at 283; *Atari Games Corp. v. Nintendo of America, Inc.*, 897 F.2d 1572, 1575 (Fed.Cir.1990), or, as other courts declare, a "substantial likelihood of success," *Sea Containers Ltd. v. Sena*, 890 F.2d 1205, 1208 (D.C.Cir.1989), or as Judge Dobie said in *Mycalex*, 159 F.2d at 912, by "clear and convincing evidence." We have found no case in which the hardship balance was not "one-sided" and did not tilt "decidedly" in plaintiff's favor that granted relief to plaintiff, even though the proof of the likelihood of success on the merits was merely sufficient to withstand a motion for a directed verdict. Far more is required under the precedents. Again, this point is another sound ground for vacating the grant of preliminary injunctive relief herein.

That the district judge used the summary judgment standard of review is obvious not only by his clear declaration to that effect but also by the manner in which he reviewed the proof of likelihood of success on the merits. In effect, the district judge based his decision simply on the opinion of Direx's expert witness, Dr. Levin. He did note that Dr. Zahn, as well as other expert witnesses of the defendant, expressed sharply differing views. He did not, however, review the difference; he simply said that Dr. Levin's testimony was sufficient to meet his test of a showing of likelihood of success, *i.e.*, that it was sufficient under a summary judgment standard. It is true he

---

**11.** The district judge is apparently referring to *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

made some comments on other facts. He did comment that Breakthrough had developed its tripter some months after Spector's arrival. He seems to deduce from this that Spector must have used the know-how of Direx in order to accomplish this feat in six or seven months. However, it is to be remembered that the district judge himself found that the development of both Direx's and Breakthrough's device represented "a fairly unsophisticated R & D effort," one consisting simply of the arrangement of a number of off-the-shelf items. (J.A. at 11.) Moreover, Direx developed its own machine within a period of about six months after Direx had received the Israeli grant. We find nothing of value in this point of the time required by Breakthrough to produce its machine.

The district judge adverted, in a comment or two, to one or more other petty details. He said that one of the components—a component freely available in the open market—was purchased with an extra string. It was explained that the component often broke, and it was only common sense to have ready at hand a replacement when such accident happened. It is unlikely that anyone would consider such an obviously prudent act a trade secret. There was another point made that both Direx's and Breakthrough's devices did not include an imaging device as an integral part of the machine. There was nothing significant about this. Both machines required as essential to their operation an imaging device. Competing machines generally included such a device as a part of the machine itself. But Direx and Breakthrough eliminated the imaging device from its tripter as a price item: by eliminating it, they reduced the cost of the machine by about $100,000. Such elimination, we repeat, did not obviate the need for an imaging device but merely required the purchaser of the Direx and Breakthrough machines to acquire independently an imaging device. There was nothing creative about this. Actually, as our quotation in note 8 shows, the district judge did not wish to compare the two machines to discuss their parallelism. The district judge concluded that such specificity was not required; it was

sufficient that a genuine issue of fact existed. This was not, however, sufficient. More than a summary judgment review was required. The district judge failed to provide such a review.

### D.

The district court recognized the public interest factors favoring the plaintiff and the defendant here. It found that the public interest in "free competition" argued in favor of the defendant. If free competition between the plaintiff and the defendant were permitted, the record suggests that the plaintiff would be forced to reduce the price of its machine from $250,000 to $90,000. Unquestionably, such competition would serve to make available to small hospitals and clinics located in communities a valuable medical treatment at a much reduced price. On the other hand, this public interest in free competition is, in the words of the district judge, "cabined by the public interest in promoting useful developments in science and technology by giving protection to proprietary information, and that is recognized as a legitimate goal of the law." (J.A. at 28.) The district judge did not seek to choose between the two competing public interests. Since the grant of preliminary relief must be vacated, we similarly avoid resolving this conflict.

### CONCLUSION

Because the district judge failed to observe the proper standards for reviewing the motion for preliminary relief and did not make the necessary findings of fact, we reverse the grant of the injunction herein and remand the case for further proceedings consistent with the rulings herein, without prejudice to the right of the plaintiff to premise its motion on new or changed circumstances.

**REVERSED AND REMANDED.**