**In re CONVENIENCE USA, INC., et al., Debtors.**

**Nos. 01–81478C–11D to 01–81489C–11D.**

United States Bankruptcy Court, M.D. North Carolina, Durham Division.

March 6, 2003.

Richard M. Hutson, II, Durham, NC, John A. Northen, Chapel Hill, NC, for debtor.

## MEMORANDUM OPINION

WILLIAM L. STOCKS, Bankruptcy Judge.

These cases came before the court on February 21, 2003, for a hearing on a motion for stay pending appeal filed on behalf of USRP (GANT 1), LLC; USRP (GANT 2), LLC; USRP (GANT 3), LLC; USRP (GANT 4), LLC; USRP (GANT 5), LLC; and USRP (GANT 6), LLC (collectively "USRP"). William B. Sullivan appeared on behalf of USRP, John A. Northen appeared on behalf of the Debtors, John H. Small and Gary W. Marsh appeared on behalf of LaSalle Bank, Diane Furr appeared on behalf of the Official Committee of Unsecured Creditors and Michael D. West appeared as United States Bankruptcy Administrator. After considering the evidence and arguments offered at the hearing, the court entered an order on February 21, 2003, denying the motion for stay pending appeal. That order indicated that detailed findings and conclusions would be forthcoming in a memorandum opinion. The court is entering this memorandum opinion in order to provide additional findings and conclusions pursuant to Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure.

## FACTS

On February 11, 2003, this court entered an order confirming Debtors' Amended Joint Plan of Reorganization (the "Plan"). Under the Plan, the Debtors are to assume the leases on 143 stores that have been operated by the Debtors, and assign those leases to the EXPREZIT! Group ("EXPREZIT"), which is to take over and operate the stores going forward. These stores are encumbered by deeds of trust and security agreements that secure $88,000,000.00 of pre-petition debt owed to LaSalle Bank. Under the plan, EXPREZIT is to assume $48,000,000.00 of the secured debt, which is to be repaid by EXPREZIT according to terms that have been agreed upon by EXPREZIT and LaSalle. The plan contains numerous other provisions under which other secured creditors are to be paid discounted cash payments and the unsecured creditors are to be paid in excess of $1,000,000.00. These payments are to be made from cash that currently is available in this case.

On February 14, 2003, USRP filed a notice of appeal in which USRP appealed from the confirmation order "but only insofar as the Order pertains to the 15 stores leased from USRP that are part of the 143 stores covered by the Debtors' Plan and approves assumption and assignment of the 15 USRP stores leases pursuant to §§ 365 and 1123(b)(2) of the Bankruptcy Code." On February 14, 2003, USRP also filed the motion for stay pending appeal which came before the court on February 21, 2003. In the motion for stay pending appeal, USRP sought a stay of the Confirmation Order "insofar as it pertains

to the 15 stores leased from USRP" until a decision is rendered by the District Court on USRP's appeal from the confirmation order.

## ANALYSIS

■ USRP apparently contemplates stay relief in which the consummation of only a part of the plan would be stayed. Under the relief contemplated by USRP, the 15 USRP stores could not be transferred and the Debtors, LaSalle and EXPREZIT are expected to close on the remaining stores not knowing whether EXPREZIT will ever receive the USRP stores and without any provisions for restructuring the debt assumption and payments called for under Plan in the event the USRP stores cannot be transferred to EXPREZIT as provided under the Plan. No authority has been cited for this novel relief and the court is satisfied that such a "partial stay" is not legally appropriate or practical in this case. In fact, it is difficult to conceive of a situation in which such relief would be appropriate because to grant such relief, in effect, is to modify the plan of reorganization that was submitted to the creditors and other parties in interest, who voted to approve the plan submitted to them, and not a plan subsequently tailored to suit a disgruntled appellant. Such an anomalous result is totally inconsistent with the disclosure requirements under § 1125 of the Bankruptcy Code and the right of creditors, pursuant to § 1126, to vote on the plan disclosed to them. For example, in the present case, before LaSalle could agree to the transaction between LaSalle and EXPREZIT that is described in the Plan, the transaction and the projections and financial analysis underlying the transaction had to be submitted to and approved by its Resolution Committee. In approving and authorizing that trans-

action, the Resolution Committee relied upon projections, analysis and a business plan that included all of the stores called for under the Plan. LaSalle has been authorized to proceed with the transaction that the parties agreed upon and not the transaction that USRP would have imposed on the parties. Additionally, even if a closing that did not include the 15 USRP stores were possible, the Debtors would be left with the 15 stores pending the outcome of the appeal, but would not have the ability to operate the 15 USRP stores, since a closing on the other stores would leave the Debtors without any employees, contracts with vendors or funds to operate the stores.

■ Apart from the usual nature of the stay relief requested by USRP, there has been no showing that any type of stay, partial or otherwise, should be granted in this case. A motion for a stay pending appeal in a sense seeks injunctive relief because the movant is asking that an event be halted, i.e., that the court order that a judgment or order not go into effect. Because of this similarity, the standards which have been adopted for the granting of a stay pending appeal are essentially the same as those required for the issuance of a preliminary injunction. *See In re Miraj & Sons, Inc.*, 201 B.R. 23, 26 (Bankr.D.Mass.1996).

Federal courts have developed two distinct standards to govern the granting of preliminary injunctions. These standards are referred to as the likelihood-of-success test and the hardship balancing test. The essential difference between these two tests or standards is that while the first begins its inquiry with the determination of "likelihood of success" on the merits and proceeds to consider in sequence other factors embraced within the standard, the second begins by balancing the harm or

injury imposed on the plaintiff in the event the relief is denied against the harm to the defendant if the relief is granted, and on the basis of such balancing proceeds to determine the degree by which a "likelihood of success" on the merits must be established before relief may be granted. The hardship balancing test has been adopted in the Fourth Circuit. *See Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir.1991).

 Under the hardship balancing test, the party seeking a stay pending appeal in the Fourth Circuit must show: (1) that it will suffer irreparable injury if the stay is denied, (2) that other parties will not be substantially harmed by the stay, (3) that it will likely prevail on the merits of the appeal, and (4) that the public interest will be served by granting the stay. *See In re Wilson*, 233 B.R. 915, 917 (M.D.N.C.1998) (citing *Long v. Robinson*, 432 F.2d 977 (4th Cir.1970)). In analyzing these factors, the court should use the balance-of-hardships test as described in the *Direx* case, in which the court first balances the hardships to the parties before determining how strong a showing of success is required by the moving party. *See In re Wilson*, 233 B.R. at 917. Under this balancing test, the likelihood of success that need be shown by the movant will vary inversely with the degree of injury the movant will suffer without a stay. If the balance of harm tips decidedly toward the movant, then the movant need not show as strong a likelihood of success on the merits as when the balance tips less decidedly. *See Direx*, 952 F.2d at 812.

### 1. Irreparable Harm.

 USRP alleges that it will suffer irreparable harm if a stay is not granted before the Debtors consummate the as-

sumption and assignment of the 15 USRP store leases and thereby "possibly" moot its appeal from the confirmation order.[1] USRP thus depends upon the possibility that its appeal may become moot as constituting irreparable harm. In some circumstances an appeal from an order confirming a plan *may* become moot if the order is not stayed and the plan is substantially consummated before the appeal is heard. *See, e.g., In re AOV Indus., Inc.*, 792 F.2d 1140 (D.C.Cir.1986). However, there is no bright-line rule that substantial consummation forecloses any possibility of appellate relief with respect to a confirmed plan of reorganization. "Determinations of mootness in this latter sense cannot be cabined by inflexible, formalistic rules, but instead requires a case-by-case judgment regarding the feasibility or futility of effective relief should a litigant prevail." *Id.* at 1147–48. A similar rule prevails in the Fourth Circuit: "Orders confirming plans of reorganization do not become immune from appellate review upon their partial, or even substantial, consummation." *Central States v. Central Transp., Inc.*, 841 F.2d 92, 96 (4th Cir.1988). The test of mootness is whether implementation of the plan has created, extinguished or modified rights, particularly of persons not before the court, to such an extent that effective judicial relief is no longer practically available. This, in turn, depends upon the nature and complexity of the transactions carried out under the plan, the parties involved in those transactions and the other circumstances of the particular case. *Id.* at 96. This determination is one to be made by the appellate court based upon the circumstances which exist at the time the appeal is before the reviewing court. Obviously, such a determination is yet to be made in the present case. However, the cases support the conclusion that at

---

**1.** See USRP's Motion for stay pending appeal, page 2, paragraph 12.

this point, USRP faces the possibility and risk that its appeal may become moot if the confirmation order is not stayed. In making the analysis required in order to determine whether a stay should be granted in the present case, the court must determine whether this risk of the appeal becoming moot constitutes irreparable harm and, if so, then apply the balance-of-hardships test.

In *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802 (4th Cir.1991), the court reviewed the meaning of irreparable harm in the context of deciding whether to grant preliminary injunctive relief. The court pointed out that the "irreparable harm" which is required must be neither remote nor speculative, but must be actual and imminent. Moreover, quoting from an earlier case, the court stated: "Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable injury." *Direx*, 952 F.2d at 812. The cases are divided on the issue of whether the risk that an appeal may become moot constitutes irreparable injury for purposes of obtaining a stay pending appeal. However, it appears that a majority of the cases which have considered the issue have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury. *See In re Sunflower Racing, Inc.*, 223 B.R. 222 (D.Kan.1998); *In re Ba–Mak Gaming Int'l, Inc.*, 1996 WL 411610 (E.D.La. July 22, 1996); *In re 203 N. LaSalle St. Partnership*, 190 B.R. 595 (N.D.Ill.1995); *In re Clark*, 1995 WL 495951 (N.D.Ill. August 17, 1995); *In re Best Prods. Co.*, 177 B.R. 791 (S.D.N.Y. 1995); *In re Moreau*, 135 B.R. 209 (N.D.N.Y.1992); *In re Asheville Bldg. Assocs.*, 93 B.R. 920 (W.D.N.C.1988); *In re Kent*, 145 B.R. 843 (Bankr.E.D.Va.1991); *In re The Charter Co.*, 72 B.R. 70 (Bankr. M.D.Fla.1987); *In re Great Barrington*

*Fair & Amusement, Inc.*, 53 B.R. 237 (Bankr.D.Mass.1985); *In re Baldwin United Corp.*, 45 B.R. 385 (Bankr.S.D.Ohio 1984). *But see, In re Country Squire Assocs. of Carle Place, L.P.*, 203 B.R. 182 (2nd Cir. BAP 1996); *In re St. Johnsbury Trucking Co.*, 185 B.R. 687 (S.D.N.Y.1995); *In re Advanced Mining Sys., Inc.,* 173 B.R. 467 (S.D.N.Y.1994); *In re Grandview Estates Assocs., Ltd.*, 89 B.R. 42 (Bankr. W.D.Mo.1988).

In the present case, the risk that USRP's appeal from the confirmation order may become moot does not constitute irreparable injury. Under the Plan, as confirmed, the Debtors are to assume and assign the 15 USRP store leases referred to in USRP's motion. In doing so, the Debtors will cure any defaults that exist with respect to such leases and also will have to compensate USRP or provide adequate assurance that USRP will be compensated for any pecuniary loss which has occurred under the 15 leases as a result of default. The confirmed Plan provides for the 15 leases to be assigned to EXPREZIT, who will assume all of the lease obligations applicable to the 15 stores. The evidence at the confirmation hearing established that EXPREZIT has strong, experienced management, a carefully crafted, sound business plan and the necessary capitalization and funding to operate successfully the stores that are to be assigned to EXPREZIT, including the 15 USRP stores. This evidence established adequate assurance of future performance of the leases as required under § 365(b) of the Bankruptcy Code. Under the confirmed Plan USRP is assured of a continuing stream of rental income and full performance of the lease terms pertaining to the 15 stores to be assigned to and operated by EXPREZIT. With respect to the remaining stores, which have been rejected by the Debtors, USRP has had posses-

sion of 6 of the stores since February of 2002, when the first rejection was authorized by this court. USRP offered no evidence regarding the nature, extent or success of any efforts to re-let these stores, and the extent to which USRP ultimately may suffer a loss as to these and the other rejected stores is a matter of conjecture. There was a reference in the USRP motion to a loss of rents "exceeding $40,000,000.00." However, no evidence was offered at the hearing to support this assertion and it appears that this figure is related to the rents for all 27 stores, rather than the 12 stores that are not being assumed, and does not take into account any mitigation of loss from re-letting the stores. Finally, as a result of the rejections by the Debtor, USRP is permitted a claim in this case pursuant to § 365(g) of the Bankruptcy Code. Under these and the other circumstances involved in the present case, the court is convinced that the risk of the USRP appeal becoming moot does not constitute irreparable injury. Such a conclusion is consistent with the Fourth Circuit view that establishing only a risk of irreparable harm/injury is insufficient to warrant the issuance of a preliminary injunction and is fully warranted by the circumstances presented in the present case.

### 2. Balancing of Hardships.

Even if the risk of the USRP appeal becoming moot could be regarded as irreparable injury, it would not follow automatically that USRP is entitled to a stay of the confirmation order. Instead, the court would be required to administer the balance-of-hardships test by balancing the harm or injury imposed on USRP in the event the stay is denied against the harm or injury to other parties if the stay is granted. Although lack of irreparable injury to the movant is a sufficient ground for denying USRP's motion for a stay, the court has weighed the hardship to USRP if the stay is denied against the injury to the Debtors and the other creditors if a stay were granted. The results of doing so weigh heavily in favor of the Debtors and the other parties who would be harmed if a stay were granted.

The evidence established that the granting of a stay in this case would be highly injurious and probably fatal to the Debtors' chances of consummating the Plan that has been confirmed or any subsequent plan of reorganization. The evidence also established that if the Debtors cannot assume and assign the USRP leases to EXPREZIT as contemplated and provided for under the Plan, a closing with respect to the remaining leases most likely will not take place. Instead, if the requested partial stay is granted, any closing between the Debtors and EXPREZIT as to the remaining stores will be delayed. Such delay, even for a matter of weeks, most likely will prove fatal to a closing ever occurring and to the Plan ever being consummated. The result is that what is characterized by USRP as a "partial stay" effectively will operate as a complete stay in this case, a result that USRP seeks to obtain without being faced with having to post an appeal bond of the size that would be required for a complete stay in this case.[2]

USRP offered no evidence to support the argument that the fifteen USRP stores could be carved out of the Plan without adversely affecting the business plan formulated by EXPREZIT and approved by LaSalle or its contention that preventing a closing on the 15 stores will not result in the Plan collapsing and never being consummated. The evidence established just the opposite. The business plan presented

2. See Debtors' Exhibit No. 17.

by EXPREZIT and accepted by the creditors contemplated the inclusion of the 15 USRP stores in order to achieve the critical mass required for the feasibility of the business plan that was relied upon by the Debtors, EXPREZIT and LaSalle in structuring the Plan and the transaction between EXPREZIT and LaSalle. Under the Plan, EXPREZIT is to be assigned a total of 30 stores in North Carolina, including the 15 USRP stores. Closing the transaction without the USRP stores would leave only 15 stores in the entire State of North Carolina. The evidence established that eliminating the 15 USRP stores would be tantamount to eliminating all of the North Carolina stores because it is not feasible from either an operational or economical standpoint for EXPREZIT to operate only 15 stores in North Carolina when its remaining stores are located in Florida, Georgia and Alabama. For example, with only 15 stores in North Carolina, the overhead for the North Carolina operations would be excessive, the ability of the 15 remaining stores to obtain the favorable terms and prices from vendors contemplated under the business plan would be undermined and the remaining stores could not be efficiently managed since 15 stores would not justify the expense of a regional supervisor, which is needed to manage the operation of multiple convenience stores. Moreover, the effect of not having the 15 USRP stores extends beyond North Carolina. One of EXPREZIT's most important contracts is its gasoline contract with Citgo under which Citgo has committed to pay the cost of upfitting many of the EXPREZIT stores provided that EXPREZIT purchases a specified volume of gasoline from Citgo. The evidence established that the 15 USRP stores are high volume stores and that the Citgo contract would be jeopardized if EXPREZIT does not acquire the 15 USRP stores. The result is that if the Debtors and EXPREZIT are delayed in closing on the 15 USRP stores, the closing on the remaining stores likewise will be delayed.

There is a great risk that the delay in closing that will result from a stay being granted would be devastating to the Debtors. If no closing occurs, the Debtors will be left in limbo. Their only alternative will be to attempt to continue the operation of the 143 stores. It is only through the use of the LaSalle cash collateral that the Debtors have been able to continue to operate its stores during this Chapter 11 case. Such operations have resulted in the consumption of the LaSalle cash collateral because the Debtors have required more cash than they have been able to generate from their operations. Given the difficulties and inefficiencies of operating under Chapter 11, Debtors will continue to consume cash collateral if they are required to continue to operate. Additionally, as long as the Chapter 11 case remains operative, the attorneys for the Debtors, LaSalle and the Unsecured Creditors' Committee will all remain in place performing services such as preparing monthly reports, dealing with extensions of the cash collateral order, monitoring developments in the case and performing other services required in an operating Chapter 11 case, as well as preparing appellate briefs and participating in the appellate process. The burden of paying these fees would further erode and significantly reduce the cash that currently is available to fund the payments that are provided for creditors under the Plan, such as the cash payments to Morgan Stanley, EMAC and the unsecured creditors. In short, continuing Chapter 11 operations will be expensive and will drastically change the landscape in this case, making it virtually impossible for the Plan to be consummated following any appreciable delay in the closing contemplated under the Plan.

The delay that will result from a stay also will adversely affect EXPREZIT and impair its ability and willingness to consummate the Plan. The EXPREZIT business plan depends in large part upon a prompt closing and EXPREZIT acquiring the 143 stores without delay. As a result, the delay associated with the granting of a stay likely will result in there being no closing with EXPREZIT and the Plan completely collapsing. For example, the evidence established that delay in the closing would adversely affect the ability of EXPREZIT to keep its management team and its work force in place. EXPREZIT faces the same problem with the vendor contracts which have been negotiated, such as the Citgo contract, which would be impaired or lost if there is delay in EXPREZIT beginning operations. The prime season for convenience stores is from Spring through the end of Summer. EXPREZIT was counting on a prompt closing in order to take advantage of this prime season in order to get off to a strong start and be assured of meeting its expectations and projections. Additionally, because of recent closings and bankruptcies involving several former competitors in the EXPREZIT market area, EXPREZIT now has a competitive advantage that will be lost with any appreciable delay in the closing. EXPREZIT developed a business plan under which it is willing to assume $48,000,000.00. EXPREZIT stands ready, willing and able to proceed as provided under the Plan and under its agreement with LaSalle. However, the evidence showed that a stay that prevents the assignment of the 15 USRP stores will result in a delay in the closing of the remaining stores and that either of these eventualities would negatively impact its business plan, create uncertainty and render the transaction unacceptable. The Debtors, LaSalle, Morgan Stanley, EMAC and the unsecured creditors are tied to this case and each other by the pre-petition debts and relationships. The outcome for these parties depends upon the consummation of the Plan. If the Plan is not consummated and the Debtors have to be liquidated, the amount available for creditors in this case will drop by $23,156,000.00, that being the difference between the Plan consideration and the proceeds that would be realized from a liquidation of the Debtors, not including the costs that would be incurred in liquidating the assets which would further reduce the distribution to creditors.[3] The parties who would be harmed by a liquidation include Morgan Stanley who would lose $100,000.00, LaSalle who would suffer a loss of $20,556,000.00, the Herndon claimants who would lose a $132,000.00 distribution and the unsecured creditors who would lose $1,050,000.00 in a liquidation.[4] Additionally, under the Plan the employees at 143 stores located in four states will retain their jobs. Liquidation of the Debtors undoubtedly will result in most of those jobs being lost. The risk of these losses weigh very heavily against the granting of a stay in this case.

The risk of harm faced by USRP is that its appeal could become moot if no stay is granted. The result of the appeal becoming moot is that USRP will be bound by the Plan pursuant to which 15 store leases are being assumed and assigned to EXPREZIT and 12 store leases are being rejected. As to the 15 stores that are being assigned to EXPREZIT, the Debtors will cure any defaults that exist with respect to such leases and also will have to compensate USRP for any pecuniary loss resulting from any defaults. Moreover, all

---

3. See Debtors' Exhibit No. 17.

4. See the testimony of Michael Leterman and Exhibit No. 17.

future lease obligations regarding the 15 stores will be assumed by EXPREZIT, a company with the ability to satisfy such lease obligations. Hence, USRP faces little risk of harm with respect to the lease obligations related to the 15 stores that are to be assigned to EXPREZIT. Under the Plan, the leases for the 12 remaining stores are being rejected. The risk of harm from these rejections and the return of the stores to USRP is monetary and will depend upon the amount of the damages that are sustained by USRP as a result of the return of the stores and the amount of the dividend that USRP receives in this case as an unsecured creditor. Given the total amount of the unsecured debt in this case, it is doubtful that the dividend to USRP will be sizeable. At the same time, however, the extent of the damages that ultimately may be sustained by USRP is a matter about which USRP offered no evidence. While it may be assumed that the 15 stores that are being assumed and assigned are profitable or potentially profitable and were more attractive to EX-PREZIT than the other 12 stores, such an assumption sheds little, if any, light on the extent of the actual amount of loss that USRP may sustain as a result of having to take the stores back and re-let them. USRP offered no evidence regarding the extent or success or likely success of any efforts to re-let the stores. As noted earlier, the reference in the USRP motion to a $40,000,000.00 loss of rents is not supported by any evidence and has no probative value. Based upon the record before the court, the amount of the damages that may be sustained by USRP is uncertain and a matter of conjecture. Given the lack of evidence and uncertainty regarding the amount of any loss that may ultimately be suffered by USRP, the court concludes that the risk of harm to the Debtors, La-Salle, the unsecured creditors and the other creditors who stand to suffer very substantial, quantified losses if a stay were granted greatly outweighs the risk of harm to USRP if no stay is granted.

3. Likelihood of Success on Appeal.

As pointed out in the *Direx* decision, the likelihood of success that must be shown by a movant seeking a stay on appeal, will vary inversely with the degree of injury the movant will suffer without a stay. If the balance of harm tips decidedly toward the movant, the movant may be entitled to relief simply by showing that the question raised regarding the merits is serious, substantial, difficult and doubtful enough as to make it fair ground for litigation. The balance of hardships in the present case, however, does not tip decidedly in favor of USRP. As explained above, the contrary is true in that the balance of hardships tips decidedly in favor of the Debtors and the creditors who face the risk of immediate and substantial harm if a stay is granted. Given this balance in favor of the Debtors and the creditors, USRP may not satisfy its burden by showing merely that it raises an issue which is "fair ground for litigation." Instead, the standard which must be met is a showing that the likelihood of success on appeal is a probability and not merely a possibility. *See Direx,* 952 F.2d at 813–14. No such showing has been made in the present case.

The primary issue raised by USRP is the same issue raised in its earlier appeal involving whether the USRP lease is severable. Based on the argument that the lease is not severable, USRP maintains that the Plan may not provide for the assumption and assignment of the lease with respect to 15 stores and provide for rejection regarding the remaining stores. For the reasons set forth in detail in the memorandum opinion and order that this court entered on February 12, 2002, this court concluded that the USRP lease is a severable contract and that under § 365 of the Bankruptcy Code the Debtors could

reject the lease as to 6 of the stores without rejecting the lease as to the remaining stores. The confirmation order, in allowing an assumption and assignment with respect to 15 USRP stores and rejection as to 6 additional stores, is based upon the same reasoning and conclusions as the February 12, 2002 memorandum opinion and order. Having carefully reviewed that opinion, this court still believes that the decision is correct. Although the opinion involves Texas law, the court believes that the opinion is based upon a correct application of applicable Texas law, as well as a proper application of § 365 of the Bankruptcy Code, and concludes that USRP has not shown that there is a *probability* that it can successfully argue on appeal that it was error for the court to allow lease assumption as to 15 leases and lease rejection as to the remaining leases.

4. The Public Interest.

The remaining factor to be considered is the public interest. To the extent that the public interest is implicated in the present case, it appears that the public interest would be served by denying the stay rather than by granting the stay. Denial of the stay will allow the Plan to be consummated. The consummation of the Plan will produce a viable, ongoing business which is consistent with and promotes the underlying purposes of Chapter 11 of the Bankruptcy Code. Additionally, numerous jobs at 143 convenience stores will be saved at a time in which there are practically daily headlines trumpeting the loss of additional jobs.

For the foregoing reasons, the court concluded that the motion for stay pending appeal filed on behalf of USRP should be denied and so ordered on February 21, 2003.