**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 24-1728**

_____

SALOMON & LUDWIN, LLC,

        Plaintiff – Appellee,

   v.

JEREMIAH WINTERS; CATHERINE ATWOOD; JENNIFER THOMPSON; ABBEY SORENSEN; ALBERO ADVISORS, LLC, d/b/a Founders Grove Wealth Partners, LLC,

        Defendants – Appellants.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Henry E. Hudson, Senior District Judge. (3:24-cv-00389-HEH)

_____

Argued: May 9, 2025                                    Decided: August 12, 2025

_____

Before QUATTLEBAUM, RUSHING and HEYTENS, Circuit Judges.

_____

Affirmed in part and vacated in part by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Rushing and Judge Heytens joined.

_____

**ARGUED:** Henry Willett, III, CHRISTIAN & BARTON, LLP, Richmond, Virginia, for Appellants. Paul Anthony Werner, III, SHEPPARD MULLIN RICHTER & HAMPTON, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Denise Giraudo, Imad Matini, Hannah Wigger, Christopher Bauer, Tifenn Drouaud, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Washington, D.C., for Appellee.

QUATTLEBAUM, Circuit Judge:

Several employees of a financial services firm left to start a competing firm and then began contacting their former clients. But they had signed employment agreements with the former employer prohibiting the solicitation of clients and use of confidential client information. The former employees, however, thought they had an out. Their old firm, like many in the financial services field, had agreed to an industry-wide protocol under which their employees could join another firm and contact former clients if they followed certain procedures. Unfortunately for the former employees, their employment agreements also said their contractual non-solicitation and confidentiality obligations, not the protocol, controlled.

The former firm sued its former employees and their newly created firm, and moved for a preliminary injunction barring any contact between defendants and their former clients and any use of the old firm's confidential information. The district court granted the injunction, finding that the former employer showed a strong likelihood of success on the merits of its violation of trade secrets claims against all defendants whether the employment agreements or the protocol controlled. According to the district court, even under the protocol, defendants were not permitted to "raid" the former firm. For the reasons set forth below, we agree the old firm is likely to succeed on the merits of those claims against the former employees, but only under the employment agreements. The new firm itself, however, is not a party to those agreements, nor did it raid the former firm as that term is ordinarily understood. So, the district court erred in issuing an injunction against the new firm. We therefore affirm in part and vacate in part.

2

**I.**

Formed in 2009, Salomon & Ludwin, LLC is a wealth management firm based in Richmond, Virginia. Salomon hired Jeremiah Winters, Catherine Atwood, Jennifer Thompson and Abbey Sorensen between 2009 and 2017. Winters and Atwood were financial advisors, and Thompson and Sorensen were operational professionals.

All of Salomon's employees generally have access to proprietary client information. Salomon takes several steps to protect this proprietary information. Most significantly, it requires financial advisors, like Winters and Atwood, to sign a Financial Services Professional Employment Agreement. And it requires operational professionals, like Thompson and Sorensen, to sign an Administrative Professional Employment Agreement. Since the relevant provisions of both agreements are largely identical, we will use the term "Agreement" to refer to both. Winters, Atwood, Thompson and Sorensen signed these Agreements in March 2022.

The Agreements contain a number of provisions that protect Salomon. They provide that Salomon has all rights to current and future clients of the firm as well as revenue generated from those clients. The Agreements state that client information is a trade secret. And they prohibit an employee from soliciting Salomon's clients for two years after the end of their employment.

On top of that, attached to each Agreement is a confidentiality agreement, which prohibits an employee from disclosing Salomon's trade secrets and client information. The confidentiality agreement also states that Salomon will suffer irreparable harm in the event of a breach of confidentiality.

3

Complicating these provisions, Salomon signed on to an industry-wide document called the Protocol for Broker Recruiting. The Protocol is a separate voluntary agreement among firms in the financial services industry that allows a departing financial advisor, with written notice, to take certain client information with them when leaving one member-firm to join another member-firm. It provides:

> The principal goal of the following protocol is to further the clients' interests of privacy and freedom of choice in connection with the movement of their Registered Representatives ("RRs") between firms. If departing RRs and their new firm follow this protocol, neither the departing RR nor the firm that he or she joins would have any monetary or other liability to the firm that the RR left by reason of the RR taking the information identified below or the solicitation of the clients serviced by the RR at his or her prior firm, provided, however, that this protocol does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for "raiding." The signatories to this protocol agree to implement and adhere to it in good faith.

J.A. 250. So long as a financial advisor complies, the Protocol shields both the departing financial advisor and the new member-firm from liability.

Complicating things a bit more, the Agreements address the Protocol, stating that:

> The parties to this agreement acknowledge that [Salomon] is not part of or subject to Broker Protocol. In the event [Salomon] elects to join the Broker Protocol, the parties further agree that this agreement shall take precedence over and shall apply, regardless of the terms of the Protocol for Broker Recruiting and that this agreement shall apply and control in the event that any term of this agreement conflicts with any term of the Protocol for Broker Recruiting.

J.A. 56, 71, 85, 99 (capitalization altered). But this provision appears outdated because Salomon joined the Protocol in March 2018—long before Winters, Atwood, Thompson and Sorensen executed these Agreements.

4

While still employed at Salomon in the spring of 2024, Winters, Atwood, Thompson and Sorensen decided to leave Salomon and found their own firm. They set up a business known as Albero Advisors, LLC. A month and a half later, they resigned from Salomon. That same day, Albero Advisors joined the Protocol. According to Winters and Atwood, their resignation letters listed the clients they served at Salomon, including client names, addresses, phone numbers, email addresses and account titles, all in accordance with the Protocol. At the same time, the departing employees began contacting Salomon's clients, informing them of their new endeavor and stating that they would be in touch. The result—Salomon lost over four hundred accounts representing hundreds of millions of dollars in client assets.

Salomon quickly sued the former employees, Winters, Atwood, Thompson, Sorensen and Albero Advisors. And because Albero Advisors had at some point changed its name to Founders Grove Wealth Partners, LLC, Salomon sued Founders Grove too. Salomon alleged (1) violations of the Defend Trade Secrets Act under 18 U.S.C. § 1836(b)(1) against all defendants; (2) violations of the Virginia Uniform Trade Secrets Act under Va. Code § 59.1-336 et seq. against all defendants; (3) tortious interference with business relations against all defendants; (4) breach of the duty of loyalty against former employees; and (5) breach of contract against former employees. Salomon also sought a declaratory judgment pursuant to 28 U.S.C. § 2201 against all defendants. Simultaneously, Salomon filed an emergency motion for a temporary restraining order, which the district court granted.

5

Salomon then moved for and obtained a preliminary injunction. As to the likelihood of success on the merits of Salomon's claims, the district court found no dispute that Salomon's client information likely constituted a trade secret and that defendants obtained that information through their relationship with Salomon.[1] Thus, in the absence of the Protocol, Salomon had shown a strong likelihood of success on the merits.[2] But because both Salomon and Founders Grove were members of the Protocol—which permits financial advisors to leave their firms with certain information—the district court determined that it had to consider the impact of the Protocol. However, the district court held that even if the Protocol controlled over the Agreements, the raiding exception to the Protocol applied because defendants had likely raided Salomon. Then, the district court found Salomon established it was likely to suffer irreparable harm, relying on Salomon's evidence regarding its business losses and Fourth Circuit precedent that holds the loss of goodwill, customers and the ability to attract new customers may entitle a party to injunctive relief. The court then found the balance of equities and public interest cut in

---

[1] The district only analyzed the trade secret claims. But that limited analysis does not affect the outcome of this appeal because "[f]inding a likelihood of success on only one claim is sufficient to justify injunctive relief." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021) (internal quotation marks and citation omitted). *See also Nabisco Brands, Inc. v. Conusa Corp.*, No. 89-2704, 1989 WL 152508 at *2 (4th Cir. Dec. 1, 1989) (stating that "showing of entitlement to preliminary injunctive relief with respect to any . . . claims . . . obviates the necessity to consider any other").

[2] Relying on substantial similarities between the federal and state trade secret statutes, the district court considered them together. And for purposes of this appeal, we do the same.

favor of granting injunctive relief. Thus, the district court granted Salomon a preliminary injunction, and defendants timely appealed.[3]

## II.

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances . . . ." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991) (internal quotation marks omitted). To prevail, a party must show: (1) likelihood of success on the merits; (2) likelihood of irreparable harm absent preliminary relief; (3) equity favors granting preliminary relief; and (4) preliminary relief is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

We review a district court's grant or denial of a preliminary injunction for abuse of discretion. *See Direx*, 952 F.2d at 814. Although we may not reweigh evidence the district court considered, a clear error in factual findings or a mistake of law merits reversal. *See Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 213 (4th Cir. 2019). We review de novo whether there has been a mistake of law. *See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 (4th Cir. 2002).

Defendants argue that the court erred in determining that if the Protocol controlled, defendants' conduct constituted raiding. We agree the court incorrectly interpreted raiding. But as to the former employees, we nevertheless affirm because the Agreements controlled

---

[3] This court has jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1) and 28 U.S.C. § 1331.

7

over the Protocol and prohibited their conduct. As to Founders Grove, we vacate the injunction because it was not a party to the Agreements.

## A. The Protocol

In determining that Salomon was likely to succeed in showing defendants' conduct constituted raiding under the Protocol, the district court first had to determine what that term meant. Without a definition in the Protocol or established case law, it relied on the parties' competing experts to define raiding. It ultimately settled on a definition of a severe economic impact on the prior firm resulting from a raider's "malice/predation and/or improper means." *Salomon & Ludwin, LLC v. Winters*, 741 F. Supp. 3d 398, 405–06 (E.D. Va. 2024) (internal quotation marks omitted). The court identified severe economic impact as the loss of 40% production but indicated this was a guideline, not a requirement. *Id*. at 406. And it found that defendants' efforts to start a competing firm while still employed by Salomon—combined with the resulting loss of 40% of Salomon's total employees, 50% of Salomon's financial advising team and approximately 30% of Salomon's business, including over 400 accounts that amounted to upwards of $300,000,000 in assets— constituted raiding. *Id*.

Defendants' appeal requires us to review the district court's interpretation of raiding, which is a legal question. *See Scarborough v. Ridgeway*, 726 F.2d 132, 135 (4th Cir. 1984) (the "interpretation of a written contract is a question of law . . . ."). We find the district court's definition is inconsistent with the text of the Protocol, the ordinary meaning of the term "raid" and the industry-specific meaning as all three suggest raiding involves a separate firm targeting employees of another firm.

8

**1. The Text**

First, the text. The Protocol says that it "does not bar or otherwise affect the ability of the prior firm to bring an action against the new firm for 'raiding.'" J.A. 250. That language applies only to an action against a firm—not individuals. Also, reading this sentence in context with the Protocol as a whole supports this interpretation. *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("A legal instrument typically contains many interrelated parts that make up the whole. The entirety of the document thus provides the context for each of its parts."). Compliance with the Protocol shields a departing financial advisor and the "firm that he or she *joins*" from liability. J.A. 250. The use of the term "joins" refers to a financial advisor leaving one firm to go work at a competing firm, not all instances of a financial advisor leaving. Thus, the Protocol contemplates liability when an outside firm preys upon another firm, not when individuals leave a firm.

History helps illustrate this distinction. Nebuchadnezzar raided Judah when his army descended from Babylon in sixth-century BC, destroying its cities and exiling its people. 2 Kings 25; Jeremiah 39. In contrast, the Continental Congress did not raid Great Britain when it declared that the 13 colonies were "absolved from all allegiance to the British Crown" and were free and independent states. THE DECLARATION OF INDEPENDENCE (U.S. 1776).

But even if the former employees leaving and starting a new competing firm wasn't, by definition, a raid, Salomon claims the subsequent solicitation of clients and taking of over $300,000,000 in assets was. Using our historical example, Salomon might argue that

9

even if the colonists didn't technically raid the British when they declared independence, they did so when they took arms and ammunition from British depots. While that argument might have some initial appeal, the text of the Protocol suggests otherwise.

Recall that the Protocol says that "[i]f departing [financial advisor]s and their new firm follow this protocol, neither the departing [financial advisor] nor the firm that he or she joins would have any monetary or other liability to the firm that the [financial advisor] left by reason of the [financial advisor] taking the information identified below or the solicitation of the client serviced by the [financial advisor] at his or her prior firm." J.A. 250. This means that, under the Protocol, taking clients is generally not actionable against either the departing advisor or the new firm they join. True, this language is followed by the language of the raiding exception permitting a prior firm to sue another firm for raiding. But if raiding captures the mere taking of clients, that would conflict with, if not nullify and render superfluous, the language absolving the departing financial advisors and new firm for doing just that. *See Funkhouser v. Spahr*, 46 S.E. 378, 380 (Va. 1904) ("[O]ne of the established canons of construction, as we have seen, is that effect shall be given to every word in the instrument to be construed, whether it be a will, a contract, a statute, or a constitution."); *see also* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence."). To avoid superfluidity, "raid" must mean something else. And as already described, it refers to intruding conduct by an outside firm to steal away employees.

10

## 2. The Ordinary Meaning

Second, the ordinary meaning of raiding also refers to a competing firm swooping in to lure employees away from their current employer—not a means of keeping employees from striking out on their own. *See TravCo Ins. Co. v. Ward*, 736 S.E.2d 321, 325 (Va. 2012) (stating that in interpreting a contract, "[w]ords that the parties used are normally given their usual, ordinary, and popular meaning" (internal quotation marks omitted) (quoting *City of Chesapeake v. States Self-Insurers Risk Retention Group, Inc.*, 628 S.E.2d 539, 541 (Va. 2006))).[4]

One tool for determining the ordinary meaning of a word is dictionaries. *Blakely v. Wards*, 738 F.3d 607, 611 (4th Cir. 2013) (en banc) (stating that when determining whether a word's meaning is plain, "we customarily turn to dictionaries for help" (internal quotation marks and citation omitted)). Using dictionaries from around the time the Protocol was drafted, "raid" is defined as "a sudden, hostile attack." *Raid*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2004); *see also Raid*, NEW WEBSTER'S DICTIONARY (2004) (defining "raid" as "a hostile incursion, a foray"). Even definitions more specific to the

---

[4] Neither of the parties briefed, nor does the Protocol address, what law governs the interpretation of the Protocol. Under Virginia law, "the law of the place where the contract was formed applies when interpreting the contract and determining its nature and validity." *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). And a contract arises "when the last act to complete it is performed." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (quoting *Seabulk Offshore, Ltd. V. Am. Home Assurance Co.*, 377 F.3d 408, 419 (4th Cir. 2004)). Here, in the absence of any contravening evidence, it appears Virginia law would apply as Salomon and Founders Grove likely signed the Protocol in Virginia, where they conduct business.

11

corporate context similarly suggest intrusion by an outsider. *See Raid*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY (4th ed. 2004) (alternatively defining "raid" as "an attempt, as by a business concern, to lure employees from a competitor"); *see also Raid*, BLACK'S LAW DICTIONARY (8th ed. 2004) (defining "raid" as "[a]n attempt by business . . . to lure employees . . . from a competitor"). Like the text, these definitions suggest that the Protocol contemplates a separate firm taking employees away from Salomon—not employees of that firm leaving of their own accord.

Another tool, corpus linguistics, largely affirms this general understanding of the term "raid." "Corpus linguistics is the study of language (linguistics) through systematic analysis of data derived from large databases of naturally occurring language (*corpora*, the plural of *corpus*, a body of language)." Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 289 (2019). "In layman's terms, corpus linguistics clarifies a term's meaning by studying the term's use across specified time periods and origins." *United States v. Boler*, 115 F.4th 316, 332 (4th. Cir. 2024) (Quattlebaum, J., dissenting). By searching the term "raid," and then reviewing each use in its context, "a broad picture of how a word or phrase was customarily used and understood during a specified time period can emerge." *United States v. Rice*, 36 F.4th 578, 583 n.6 (4th Cir. 2022). To start, the Corpus of Contemporary American English ("COCA") "contains over one billion words of text . . . from eight genres: spoken, fiction, popular magazines, newspapers, academic texts, TV and movie subtitles, blogs, and other web pages" spanning 1990 through 2019. Corpus of Contemporary American English, https://www.english-corpora.org/coca/ [https://perma.cc/9JQP-9M42] (last visited July 30, 2025).

12

Searching the word "raid" for uses between 2000 and 2009, the years surrounding the Protocol's drafting, produced 2085 hits. COCA's random sampling function pulled 100 hits from that total, which are attached as an appendix. And while not all of the uses of "raid" in the sample contain sufficient context to lend support here, many uses do—affirming that a raid involves hostile intrusion. For example, 11 of the 100 samples reference some form of aerial raid between hostile parties, including well-known air raids of World War II between Germany and Great Britain. Another 10 reference law enforcement or investigative raids in connection with criminal activity. Even biology lends support to our understanding of the term raid. Natural History Magazine describes a specific bird's tendency to "raid spider webs for ensnared arthropods." Spanning differences in discipline, medium and time, corpus linguistics affirms that a raid requires one party attacking another—not merely a faction of a group leaving.

### 3. The Industry-Specific Meaning

Finally, even if we accept the district court's definition of raiding from the financial services industry, raiding necessarily requires an outside firm. The article the district court largely relied on says so. John D. Finnerty et al., *Calculating Damages in Broker Raiding Cases*, 11:2 Stan. J.L. Bus. & Fin. 261, 262–63 (2006) ("In a field where authorities have difficulty agreeing upon the very definition of raiding, how does a practitioner or party know when the case at hand involves a raiding claim? A recent legal conference on raiding in the securities industry attempted to answer this very question, eventually defining *raiding* as a 'compensable hiring of producers in a definable business unit of one firm *by a competing firm*.'" (second emphasis added)). This makes sense because otherwise raiding

13

would be reduced largely to a numbers game based on some percentage of economic impact to the old firm. Imagine two partners form a financial services shop. After a while, a personality conflict develops. One decides to start a new endeavor and departs, complying perfectly with the Protocol. So long as a significant number of clients decided to stick with him at his new firm, there would likely be liability for raiding under the district court's definition.[5] But if that same professional worked at a large enough firm and the percentage was not triggered on his departure, there would not be raiding. This goes too far.

To summarize, defendants' conduct could not constitute raiding for two reasons. First, four of the five defendants are individuals. And the Protocol's plain text establishes that the raiding exception applies only to firms. Second, the remaining entity defendant, Founders Grove, did not seek to lure employees away from Salomon. It was created by the former employees so that they could start a new endeavor after resigning from Salomon using the very information they were expressly permitted to take under the Protocol. Such conduct is not raiding under the text of the Protocol or as the term is understood by its ordinary meaning or its meaning in the financial services industry. Thus, we decline to affirm the preliminary injunction based on the Protocol as to either the former employees or Founders Grove.

---

[5] Even more problematic of a result, the departing partner might not even ask clients to move with him. But so long as enough chose to transfer to his new firm, that would be sufficient to constitute a raid without any affirmative conduct of the partner.

14

**B. The Agreements**

But just because defendants' conduct does not constitute raiding under the Protocol does not mean the injunction was improper. "[W]e are not limited to evaluation of the grounds offered by the district court to support its decision, [and we] may affirm on any grounds apparent from the record." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005); *see also S.E.C. v. Fife*, 311 F.3d 1, 8 (1st Cir. 2002) ("We may affirm the district court's grant of a preliminary injunction . . . on any grounds supported by the record."). The plain language of the Agreements provides such an alternative ground for finding likelihood of success on the merits as to the former employees, but not as to Founders Grove.

Under Virginia law, "[t]he pole star for the construction of a contract is the intention of the contracting parties *as expressed by them in the words they have used*." *Ames v. Am. Nat'l Bank of Portsmouth*, 176 S.E. 204, 216 (Va. 1934) (emphasis in original); *see also TM Delmarva Power v. NCP of Virginia*, 557 S.E.2d 199, 200 (Va. 2002) ("Contracts between parties are subject to basic rules of interpretation. Contracts are construed as written, without adding terms that were not included by the parties."). The words used by the parties in the Agreements indicate that the Protocol does not apply to Winters, Atwood, Thompson and Sorensen. Recall, the Agreements state:

> The parties to this agreement acknowledge that [Salomon] is not part of or subject to Broker Protocol. In the event [Salomon] elects to join the Broker Protocol, the parties further agree that this agreement shall take precedence over and shall apply, regardless of the terms of the Protocol for Broker Recruiting and that this agreement shall apply and control in the event that any term of this agreement conflicts with any term of the Protocol for Broker Recruiting.

15

J.A. 56, 71, 85, 99 (capitalization altered).

Under that language, if Salomon was not a member of the Protocol, the Agreements would control. And if Salomon became a member of the Protocol, the Agreements would also control. But does that leave a contractual gap where, as here, Salomon was *already* a member at the time the Agreements were signed? Perhaps. But the text of this provision, read as a whole, indicates that the Agreements prevail over the Protocol whether or not Salomon is a member. Precisely when Salomon became a member does little to change that. And to accept any other reading would contravene Virginia law, which prohibits us from "read[ing] into contracts language which will add to or take away from the meaning of the words already contained therein." *Wilson v. Holyfield*, 313 S.E.2d 396, 398 (Va. 1984). Put simply, the meaning of the words here indicate the Agreements control over the Protocol regardless of Salomon's Protocol-membership status.

With that issue settled, the non-solicitation and confidentiality provisions of the Agreements likely prohibit the former employees' conduct. Indeed, the former employees all but admitted below, and do not dispute on appeal, that "[Salomon]'s client information constitutes a trade secret" and that they took it with them to start Founders Grove. *Salomon*, 841 F. Supp. 3d at 405. Thus, Salomon has shown a strong likelihood of success on the merits of its trade secrets claims as to the former employees.

However, the district court's preliminary injunction broadly enjoined all defendants, including the newly formed entity, Founders Grove. And Founders Grove was not a party to the Agreements. Therefore, it cannot be enjoined on that basis. Of course, Winters and

Atwood are the members of Founders Grove, and all four individuals are now employees at Founders Grove. To be clear, the injunction as to the former employees extends to actions they take on behalf of Founders Grove. But to the extent the district court preliminarily enjoined Founders Grove itself, we find that was an abuse of discretion. [6]

Because the former employees' main line of attack was that they should enjoy the protections of the Protocol, they hardly marshal a defense under the Agreements on irreparable harm,[7] balance of equities or public interest. In the absence of any argument to the contrary, we find no abuse of discretion in the district court's assessment of the remaining *Winter* factors as to the former employees under the Agreements.

---

[6] While we vacate the injunction as to Founders Grove, we make no determination on the merits of Salomon's trade secret claims, or any other claims, against it.

[7] Irreparable harm requires a plaintiff to make a "clear showing that it will suffer harm that is neither remote nor speculative, but actual and imminent." *Mountain Valley*, 915 F.3d at 216 (internal quotation marks and citation omitted). "[P]ermanent loss of customers to a competitor or the loss of goodwill" constitutes irreparable injury. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see also Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) ("[T]he Fourth Circuit has repeatedly recognized that the threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm." (cleaned up)). Here, Salomon has identified *millions* of dollars transferred in the weeks following defendants' announcement. And the quantity of accounts lost here is substantial—449 at the time of the district court's preliminary injunction hearing. While money alone does not constitute irreparable harm, here it serves as a tangible indicator of intangible losses—such as lost goodwill, lost customer trust and damage to reputation. *See Coreth*, 535 F. Supp. 3d at 517–18 (finding that "evidence of lost customers, lost goodwill, lost customer trust, and damage to reputation," as evidenced by lost accounts, satisfied irreparable harm).

**III.**

In sum, the district court did not abuse its discretion in granting the preliminary injunction as to the former employees. It did, however, abuse its discretion in granting the preliminary injunction as to Founders Grove. Therefore, the district court's order is,

*AFFIRMED IN PART AND VACATED IN PART.*

**APPENDIX**

|  | Year | Source Type and Source | Excerpt of Concordance Line |
|---|---|---|---|
| 1 | 2004 | Magazine: Harper's Magazine (Mar.) | . . . a T-shirt salesman, his military background and media ambitions inspired him to enter the Raid Gauloises, an annual French race that sent teams on rugged courses through the . . . |
| 2 | 2006 | Newspaper: New York Times (Jan. 15) | . . . On Saturday, a Central Intelligence Agency spokesman declined to comment on any raid that might have taken place. The agency is known to operate armed Predator aircraft . . . |
| 3 | 2003 | Spoken: CBS, 60 Minutes (Mar. 30) | . . . No one knows for certain. BRADLEY: Shortly after the raid on Orao, Croatian authorities, acting on a tip from U.S. intelligence, intercepted . . . |
| 4 | 2003 | Fiction: Analog Science Fiction & Fact (Nov.) | . . . that will let us into the ship." "Bring an enemy to the raid." Blake was incredulous. "Bring a defector. An ally. That . . . |
| 5 | 2004 | Magazine: People (Apr.) | . . . "I was up to no good," he says. "The raid was a turning point. I knew I had to get on the right path . . . |
| 6 | 2004 | Newspaper: New York Times (Oct. 23) | . . . tipped that Mr. Khashiyev was in the house, General Shabalkin said. The raid began at about 6:20 p.m., when roughly 50 Russians surrounded the house, survivors . . . |
| 7 | 2001 | Spoken: National Public Radio, All Things Considered (Nov. 22) | . . . the cops just blew on in here, and we're in some kind of raid. I just hope they will release us for the Thanksgiving day parade. . . . |
| 8 | 2007 | Academic: Church History (June) | . . . representatives of the federal justice department who conducted a raid in which polygamists (mainly males) were arrested and imprisoned, . . . |
| 9 | 2004 | Newspaper: San Francisco Chronicle (Nov. 17) | . . . along the length of the side wall and into a crevice. Visitors asked for Raid. I declined. I didn't spray them with soapy water or put down . . . |
| 10 | 2006 | Fiction: The Protectors of | . . . for protection: Durmuk's troops had been crossing through Plothy Pass almost daily to raid border settlements (furious denials from |

19

| | | | |
|---|---|---|---|
| | | Science Fiction (June) | the uniformed men) and were massing in great . . . |
| 11 | 2003 | Magazine: Sports Illustrated (Feb.) | . . . Gordon and Johnson start howling with laughter-it's all a goof, a snapshot panty raid. As Sadler puts the camera away, Gordon pulls out a felt-tip pen and . . . |
| 12 | 2007 | Movie: *Bats: Human Harvest* | . . . nuclear, biological, chemical. Target the source, stop distribution. Your Iraqi raid exposed a network that is hell bent on acquiring these weapons. Key money men . . . |
| 13 | 2008 | Spoken: National Public Radio, Tell Me More (Mar. 14) | . . . Thank you. Hello. MARTIN: Juan, Uribe had to know the cross-border raid would raise hackles. Why did he think it was worth it? FORERO: . . . |
| 14 | 2004 | Spoken: National Public Radio, All Things Considered (Sept. 4) | . . . be smuggled in from nearby Syria into Iraq. Now the US military launched the raid in the morning. They say several fighters were killed and more than a dozen . . . |
| 15 | 2001 | Fiction: *Wild Justice* by Phillip Margolin | . . . you doing here?" "The police," Grant gasped. "A raid." "At the airfield?" "Let me in, for God . . . |
| 16 | 2003 | Spoken: CNN, Daybreak (Aug. 4) | . . . in fact, in the past 24 hours, including this morning. In a raid conducted yesterday, the 4th Infantry Division that usually operates around Tikrit in the north . . . |
| 17 | 2005 | Movie: *Munich* | . . . OLYMPICS VILLAGE (NEP STADIUM) 11C The Munich police are suiting up for the raid, putting on bulky kevlar vests and then track suits on top of them, . . . |
| 18 | 2001 | Newspaper: Chicago Sun-Times (Dec. 13) | . . . ridiculous, but blindly biased. As an example, three weeks prior to the raid on the Panther headquarters, there was another event that Dyson overlooked as he glorified . . . |
| 19 | 2000 | Spoken: ABC, Good Morning America (Apr. 24) | . . . I knew the attorney general was acting in good faith. I never knew a raid had been planned. We could have arranged, in my opinion, a peaceful . . . |
| 20 | 2000 | Fiction: *A Country in the Mind* by John L. L. Thomas | . . . The people's property was at stake, their money was subsidizing a raid on their own wealth. "You had better make sure that your Representatives and . . . |

20

| 21 | 2004 | Spoken: National Public Radio, Daybreak (May 24) | . . . it's not clear; the military is disputing that. We had the raid on the headquarters of Ahmad Chalabi, who was basically our guy in Iraq. . . . |
|---|---|---|---|
| 22 | 2000 | Magazine: Military History (Feb.) | . . . of the St. Armand area, concerned about their lack of defense during the Fenian raid of 1866, sent two representatives south to Massachusetts, where they bought 40 Ballard . . . |
| 23 | 2002 | Academic: Archaeology (July/Aug.) | . . . public during the Second World War." "The museum curator was the air raid warden," Crummy adds. On the main floors of the museum, . . . |
| 24 | 2002 | Academic: American Studies International (June) | . . . a white government scout and a white mother. His mother was killed in a raid by Kiowas and Comanches, according to Griffis, and he was taken captive, . . . |
| 25 | 2009 | Academic: Geographical Review (Apr.) | . . . in 1925. It replaced one that had been set after William Quantrill's 1863 raid. (Photograph by the author, March 2004) PHOTO (BLACK &; . . . |
| 26 | 2001 | Newspaper: Denver Post (Nov. 12) | . . . Akber entered Ukraine illegally a month ago and was captured in a police raid on an apartment in mid-October. Under Ukrainian law he will be imprisoned for a . . . |
| 27 | 2005 | Magazine: PC World (May) | . . . with integrated 802.11g wireless, it offers two SATA RAID controllers as well as ATA-133 RAID. Asus added an IDE RAID controller to the Fatality to augment the 925 and . . . |
| 28 | 2000 | Magazine: Consumer Reports (Mar.) | . . . accounts also have built-in disincentives that prevent you from tapping them prematurely. If you raid most tax-deferred retirement accounts before you reach age 59 1/2, for example, you . . . |
| 29 | 2002 | Fiction: Michigan Quarterly Review (Fall) | . . . on his last visit to Robert and his bride, had made a late-night raid on the family refrigerator in nothing but his undershirt. Crea, hearing the noise . . . |
| 30 | 2006 | Newspaper: USA Today (Nov. 13) | . . . of the Army's 1st Battalion, 23rd Infantry Regiment, which assisted in the raid. U.S. investigators believed the compound was run by al-Sadr loyalists, he says. . . . |
| 31 | 2005 | Television: The Shield (S4.E6: | . . . seizure policy right now. What are you talking about? Well, the church raid stirred up a shit |

21

| | | Insurgents aired Apr. 19) | storm. So you're offering me up as a sacrifice. . . |
|---|---|---|---|
| 32 | 2000 | Spoken: CNN, Live Event (Apr. 24) | . . . think that was appropriate? LOCKHART: The president knew the general details of the raid, and the president does think that it's appropriate. There were – there . . . |
| 33 | 2001 | Magazine: Natural History (July/Aug.) | . . . At times of the day when insects are less active, the birds will raid spider webs for ensnared arthropods. Like many other hummingbirds, male bluethroats defend a . . . |
| 34 | 2003 | Spoken: National Public Radio Morning Edition (Apr. 9) | . . . Unidentified Man: Is Saddam Hussein alive? Was he killed in the air raid over a Baghdad neighborhood? SMITH: Wasn't this the way the war started . . . |
| 35 | 2009 | Television: Dark Blue (S1.E7: O.I.S. aired Aug. 26) | . . . Four days after I talked to him… Osiri was killed in a drug raid led by Fry's task force. Thing is - Osiri didn't sell drugs . . . |
| 36 | 2009 | Academic: ABA Journal (Apr.) | . . . without a warrant and arrested Callahan. The Utah state courts ruled the police raid was an unconstitutional invasion and threw out the evidence. Callahan then sued Cordell Pearson . . . |
| 37 | 2001 | Newspaper: New York Times (Oct. 21) | . . . than one service were involved in the overnight attack, the first major American commando raid since Somalia nearly a decade ago. Army Rangers, Green Berets, Navy Seals . . . |
| 38 | 2009 | Newspaper: Christian Science Monitor (May 19) | . . . of Iranian-funded Shiite militias involved in weapons smuggling. One suspect was killed in the raid and six others detained before Iraqi authorities ordered their release. One US military . . . |
| 39 | 2007 | Spoken: Fox O'Reilly Factor (Mar. 15) | . . . to Fort Devens for processing and possible deportation. Massachusetts Governor Deval Patrick denounced the raid even though the feds say he was informed about it beforehand, as were a . . . |
| 40 | 2006 | Newspaper: Associated Press (Aug. 2) | . . . (i) Loss (income) from disposal of the IBM i/p Series RAID business and Systems business, impairment of the IBM i/p Series RAID long-lived assets, . . . |

| 41 | 2007 | Spoken: CNN Newsroom (June 16) | . . . Here now his report. KARL-PENHAUL-CNN-: U.S. military commanders tell us this raid took place on June the 9th, but because of the sensitivity of the information . . . |
|---|---|---|---|
| 42 | 2001 | Newspaper: San Francisco Chronicle (Sept. 16) | . . . up in the sky. It reminded me I grew up responding to the air raid signals, with the automatic duck and cover, with the fear of the atom . . . |
| 43 | 2006 | Spoken: CNN, Live (Aug. 12) | . . . And no wonder, the firefighters had not even cleared the scene when the air raid sirens wailed again. UNIDENTIFIED-MALE: Very, very, very dangerous. All the . . . |
| 44 | 2000 | Magazine: Time (Jan. 24) | . . . Chechens were just biding their time. Last week guerrillas came out of nowhere to raid three important towns. Creeping into Argun, mixing with local residents, attackers assaulted . . . |
| 45 | 2003 | Spoken: CNN, Daybreak (July 29) | . . . big results. A Saddam Hussein bodyguard, two associates now in custody. The raid occurred in Saddam Hussein's ancestral hometown of Tikrit. That's where a lot . . . |
| 46 | 2005 | Newspaper: Atlanta Journal-Constitution (Oct. 16) | . . . to drown out the drone of Black Hawk helicopters lifting off for a three-day raid on a suspected weapons factory. In Iraq, not even the church sanctuary . . . |
| 47 | 2000 | Magazine: Boys Life (Dec.) | . . . air. Pastor Van Heyden sent everyone home from worship for fear of another bombing raid. "There are too many planes for that," Hein's friend Piet . . . |
| 48 | 2006 | Newspaper: Christian Science Monitor (Apr. 4) | . . . Iraqi Army base here, Iraqi and US officers hash out plans for an evening raid on the home of a suspected IED maker - the son of insurgent leader Abu . . . |
| 49 | 2002 | Fiction: *Hemlock Bay* by Catherine Coulter | . . . had brought them down. Savich called all the agents who had participated in the raid together. "When the barn doors swung in, did anyone see anything? . . . |
| 50 | 2009 | Spoken: Fox, Sunday (Nov. 15) | . . . this -- where was Khalid Sheikh Mohammed arrested? In Pakistan in a pre- dawn raid. He wasn't read his rights. It's going to be... CHENEY . . . |
| 51 | 2006 | Spoken: CNN, Live (Aug. 12) | . . . on that. (COMMERCIAL-BREAK) LIN: A quick check of the headlines. British |

23

| | | | police raid Internet cafes in their search for evidence in the alleged airline terror plot. They . . . |
|---|---|---|---|
| 52 | 2008 | Magazine: Military History (July/Aug.) | . . . Ranger independently, mostly in the Irish Sea. His first major engagement was a raid on the British port of Whitehaven on April 22 and 23. It was hardly . . . |
| 53 | 2000 | Magazine: Military History (Feb.) | . . . One night, or rather very early in the morning the RAF returned from a raid into Germany and, as usual, dropped a few bombs on our airfield. . . . |
| 54 | 2001 | Newspaper: Associated Press (Apr. 16) | . . . leading to the raid. Pictures and informational graphics showed readers how the raid was completed in less than three minutes. Other reporters provided dispatches from Miami's . . . |
| 55 | 2007 | Newspaper: Christian Science Monitor (July 17) | . . . members, in an interview at the US base Normandy the day after the bombing raid. Mr. Abdullah and three of his comrades, all Sunnis from the Jubour . . . |
| 56 | 2009 | Academic: Geographical Review (Apr.) | . . . offered defensive aid, to no avail (Cutler 1883). Survivors of the raid, along with businessmen and politicians, paid for the monument after raising money through . . . |
| 57 | 2008 | Newspaper: Washington Post (Apr. 14) | . . . to gain the confidence of polygamist groups. "We do fear that this raid is going to have an impact on those relationships," said Shurtleff's spokesman . . . |
| 58 | 2005 | Television: Night Stalker (S1.E4: Burning Man aired Oct. 20) | . . . 's our understanding that you haven't spoken to anyone in the press since the raid. The raid was a black mark on the Bureau. Questions were raised about . . . |
| 59 | 2001 | Spoken: National Public Radio, Saturday (May 26) | . . . would finally annihilate their prisoners outright as they retreated. The heroic story of that raid to free the prisoners, and of the persistence of the men inside Cabanatuan, . . . |
| 60 | 2003 | Newspaper: Washington Post (July 26) | . . . from the 101st Airborne Division, used great restraint and limited firepower in Tuesday's raid in a concerted effort not to injure civilians in the neighborhood. "The . . . |
| 61 | 2002 | Spoken: ABC, Good Morning America (Sept. 11) | . . . around the country. And we have some breaking news this morning about an FBI raid in Baltimore, and ABC's John Miller joins us now with the latest on . . . |

24

| 62 | 2009 | Spoken:      PBS, News Hour (Sept. 10) | . . . it seemed heroic and necessary, but questions are being asked about whether the raid to rescue a British journalist and his Afghan colleague was wise and whether the journalists . . . |
|----|------|------|------|
| 63 | 2000 | Spoken:      CNN, Sunday   Morning (Apr. 23) | . . . reporters, cameramen and sound technicians. Few Miami police patrolled the block where the raid occurred, but they did set up a perimeter a few blocks away to contain . . . |
| 64 | 2008 | Television: Terminator:   The Sarah    Connor Chronicles (S2.E9: Complications aired Nov. 17) | . . . he do? Jess, what did he do to you? There was a raid on a bunker. Metal was everywhere. They took out our command, killed . . . |
| 65 | 2009 | Academic: Geographical Review (Apr.) | . . . (1883,131). In his book, dedicated to the victims of Quantrill's raid, the Lawrence native E. S. Tucker stated, "This was the most savage . . . |
| 66 | 2002 | Newspaper: Chicago     Sun-Times (Mar. 17) | . . . from his bed in the middle of a night and ordered to join an  unauthorized raid behind enemy lines to be led by Patton. The general had become convinced Hitler . . . |
| 67 | 2006 | Newspaper: Chicago     Sun-Times (Apr. 18) | . . . House of Representatives, is elected secretary of   state.   March   1993:   Investigators raid a secretary of state facility in Libertyville to probe allegations that driver's licenses are . . . |
| 68 | 2005 | Newspaper: New York Times (Oct. 22) | . . . no links to the case who were taken to the gallows by mistake. Raid Juhi, the investigative judge who spent hours questioning Mr. Hussein and other defendants in . . . |
| 69 | 2009 | Spoken:      Fox: Glenn Beck (Sept. 14) | . . . of the essence. Back in a minute. BECK: There's another terror raid. You know, I ask that we keep our police officers and our fire . . . |
| 70 | 2005 | Magazine:    Time (Feb. 7) | . . . Its imam and congregation are known to be hostile to U.S. forces. The raid's focus shifts to a building marked as House 69 on the soldiers' maps . . . |
| 71 | 2007 | Magazine:     Ms. Magazine (Spring) | . . . More QM Blog From Iraq. Here, a short excerpt about a neighborhood raid by "security forces" on the night of Riverbend's cousin J's 16th . . . |

| 72 | 2001 | Magazine: PC World (July) | . . . Athlon CPU, 256MB of DDR SDRAM, two 3oGB hard drives in an IDE RAID configuration, and MicroSoft Office 2000 Professional. The MTower SP's 16X/10X/40X CD-RW drive . . . |
| 73 | 2003 | Spoken: CNN, Live (Dec. 20) | . . . 21 crewmen are now in U.S. Naval custody. Today's arrests follow Monday's raid on another vessel that turned up nearly $10 million of hashish and linked some of . . . |
| 74 | 2003 | Newspaper: Atlanta Journal-Constitution (Oct. 15) | . . . about a dozen villagers in central Henan were beaten up and arrested in a night raid after more than 100 of them protested for better medical care. In August, . . . |
| 75 | 2002 | Magazine: Military History (June) | . . . took 6,000 infantry and 1,000 cavalry, telling them they were going on a night raid against Hannibal. Obviously, he was doing everything possible to keep Hannibal in the . . . |
| 76 | 2009 | Television: Battlestar Galactica (S4.E13: The Oath aired Jan. 30) | . . . this place was down here. Yeah, everybody did. Got trashed during the raid on New Caprica, but I brought it back online for this. I came . . . |
| 77 | 2003 | Spoken: National Public Radio, Daybreak (Oct. 20) | . . . was disclosed that there were samples of substances that might be steroids found during the raid. Right now, as far as we know, the reason that they want . . . |
| 78 | 2001 | Magazine: Military History (June) | . . . and a strong detachment shadows the enemy army, preventing it from fanning out to raid and pillage. The dogging force snipes at the enemy's rear until the raiders . . . |
| 79 | 2007 | Newspaper: Atlanta Journal-Constitution (Apr. 14) | . . . the way. RUSTY CARTMILL, Alpharetta Fascist police became crooks in poker raid Criminals brazenly barged into a nice Roswell home in a quiet neighborhood on Monday . . . |
| 80 | 2002 | Spoken: CNN, Saturday Morning (Oct. 26) | . . . in Moscow and that's where we're headed now. That is a predawn raid. It ended a three day hostage stand-off that saw Chechen rebels threatening to kill . . . |
| 81 | 2001 | Spoken: National Public Radio, Saturday (Aug. 25) | . . . ? -- come to think of it. Mr-SHEARER: No. SIMON: Standard air raid. Mr-SHEARER: Business as usual, yeah. SIMON: Until the middle of . . . |

| 82 | 2003 | Academic: Journal of American Ethnic History (Spring) | . . . in the city's red light district via the Galveston movement, Fox organized a raid with the mayor and police commissioner. The women were told to mend their ways . . . |
| 83 | 2003 | Newspaper: USA Today (May 14) | . . . whether Saudi law enforcement may have botched an opportunity to stop the attacks when its raid on a home here last week went awry and the suspected al-Qaeda members escaped. . . . |
| 84 | 2005 | Newspaper: Atlanta Journal-Constitution (Apr. 16) | . . . by helicopter after one broke his leg and the other hurt his back during the raid on Al Jaff. Missions continue throughout the day and night, and the . . . |
| 85 | 2008 | Magazine: PC World (July) | . . . $500 without drives) This storage device uses disk and storage virtualization algorithms instead of RAID 5 to provide data redundancy. 41 Google Gmail (e-mail, free) Google . . . |
| 86 | 2005 | Spoken: CBS, 60 Minutes (Feb. 23) | . . . On this night, they'd entered into the most dangerous part of the city to raid a telecommunications building where they believed three insurgents were hiding. As they forced their . . . |
| 87 | 2000 | Newspaper: Associated Press (July 11) | . . . which owns part of the television station, news reports said. The raid on Media-Most was the second in three months, and it followed the arrest last . . . |
| 88 | 2001 | Newspaper: Washington Post (Dec. 13) | . . . in real life. His comparison of nerve gas to household bug killers like Raid is "wrong info," they said, as was his stating that the . . . |
| 89 | 2004 | Magazine: Good Housekeeping (Feb.) | . . . Mark is about to break onto the big screen in the war drama The Great Raid, the couple remain committed to each other and to their family: "We . . . |
| 90 | 2009 | Fiction: Fantasy & Science Fiction (Feb.) | . . . was the last time we got lucky in anything?" He meant the last raid north into the Colorado free state, where rebel hostiles had an ambush waiting for . . . |
| 91 | 2008 | Academic: Social Work (Jan.) | . . . assess detained adults transferred to Fort Devens in Massachusetts in the immediate aftermath of the raid and then flew two teams to detention centers in El Paso and Harlingen, Texas . . . |

| | | | |
|---|---|---|---|
| 92 | 2005 | Television: Law & Order: Special Victims Unit (S7.E6: Raw aired Nov. 1) | . . . least you got them. You're gonna like this. During the subsequent raid, we found some information at may be pertinent to your case. WHITLOCK RESIDENCE . . . |
| 93 | 2006 | Spoken: CNN, Lou Dobbs Tonight (Oct. 25) | . . . boldly brandishing weapons just hours after Iraqi special forces and their U.S. advisers launched a raid against, according to the U.S. military, a top death squad commander. Later . . . |
| 94 | 2002 | Newspaper: Christian Science Monitor (Jan. 28) | . . . six choppers that lifted off into the blue sky, ending another dramatic anti-Al Qaeda raid in eastern Afghanistan. The two-day operation - which amounted to a siege and a . . . |
| 95 | 2004 | Fiction: *SpinState* by Chris Moriarty | . . . while the AI goes fishing. We're after whatever you can get on this raid. Source code, hardware, wetware. Especially wetware. Once the AI has . . . |
| 96 | 2007 | Newspaper: Associated Press (June 6) | . . . and Iraqi Kurds act on their appeals for a crackdown on separatist fighters, who raid southeast Turkey after resting, training and resupplying at bases in northern Iraq. . . . |
| 97 | 2006 | Spoken: CNN, Situation Room (June 12) | . . . of nowhere and hit a market in Balad. Seven terrorists were killed in a raid in Baquba. During that raid, officials say two boys, ages six months . . . |
| 98 | 2005 | Television: 24 (S4.E6: Day 4: 12:00 p.m.-1:00 p.m. aired Jan. 24) | . . . The White House has confirmed that the interrupted video transmission was caused by a raid mounted by the marines and the Counter Terrorist Unit who rescued secretary of defense James Heller moments ago . . . |
| 99 | 2004 | Spoken: CNN, Live Sunday (May 9) | . . . The smoldering Shiite uprising reignites in Baghdad's Sadr city. Following an American raid overnight, that netted two top deputies of militant Shiite cleric Muqtada al-Sadr. . . . |
| 100 | 2001 | Spoken: NBC, Dateline (July 30) | . . . tell psychologists that he had killed a mother and her four small children during a raid on a Vietnamese village. And while Army records make no mention of the incident . . . |

28